UNITED STATES of America,

v.

James GILKESON, Defendant.

No. 5:05–CR–399.

United States District Court, N.D. New York.

May 9, 2006.

Frank Policelli, Esq., Utica, NY, for Defendant.

Hon. Glenn T. Suddaby, United States Attorney, Syracuse, NY (John G. Duncan, Assistant U.S. Attorney, of Counsel), for Government.

### MEMORANDUM DECISION
### and ORDER

HURD, District Judge.

## I. INTRODUCTION

Defendant James Gilkeson ("defendant" or "Gilkeson") was arrested by the Syra-cuse Police for endangering the welfare of a child in violation of New York Penal Law § 260.10. During the course of interrogation he signed a consent form permitting the search of his computer. The results of the search resulted in a federal indictment listing charges related to child pornography under 18 U.S.C. § 2252A(a)(2) and 2256(8)(A).

Defendant moves to suppress the physical evidence seized under the auspices of the consent to search. Defendant also appeals the decision issued by Magistrate Judge George H. Lowe ("Judge Lowe") ordering his detention pending trial. The Government opposes both motions. A suppression hearing was held in Utica, New York, on December 16, 2005, and continued on January 4, 2006. Decision was reserved.

At the suppression hearing, the government offered the testimony of four Syracuse police officers: Bruce Terry ("Officer Terry"), Brendan Finnerty ("Detective Finnerty"), Rickey S. Williams [1] and Christopher DeJoseph ("Detective DeJoseph"). The defendant testified on his own behalf and offered the testimony of Syracuse police officers Rebecca E. Thompson ("Lt.Thompson") and Chad Monroe ("Officer Monroe").

The defendant argues that the Syracuse Police lacked probable cause to arrest him and that his illegal arrest prevents admission of derivative evidence seized as a result. The defendant also raises the issue of the violation of his *Miranda* rights. He argues that his requests for counsel were ignored. Finally, the defendant contends that his signing of the Search and Seizure Waiver form ("consent form") was not voluntary.

---

**1.** Officer Rickey Williams works in the Youth Enforcement Section of the Syracuse Police Department. He interviewed the child involved in the incident.

The factual determinations required in the instant case are primarily based on credibility assessments of the various witnesses; credibility assessments are explained where such determinations are made as to disputed material facts. Fact finding does not require that all non-material issues of fact be determined, thus some issues are simply related as disputed or as explained during testimony.

## II. FINDINGS OF FACT

### A. Suppression Hearing Testimony

Gilkeson is an educated and self-employed forty-nine-year-old white male.[2] On August 13, 2005, he drove on Interstate Route 81 from his home in Kirkwood, New York, to Syracuse, New York. The defendant explained that the 75–mile drive to his intended destination at the Carousel Mall seemed like a good test-drive considering that he had just put his car on the road. However, he left Route 81 before reaching the Carousel Mall and at approximately 10:00 that morning entered a convenience store on S. Salina St. in Syracuse. He purchased some crackers and a soft drink. Inside, he encountered a nine-year-old African–American girl with a large burn on her leg. When the defendant asked her about it she told him she was burned by an iron. He commented that she would always have a scar. The defendant left the store but remained outside eating his crackers.

As the girl left the store and proceeded to walk home, Gilkeson claims she was struggling with her packages. The defendant pulled his car up beside her, opened the car door, told her to get in and he would give her a ride home. Monique Williams ("Williams"), a woman who happened to be nearby, witnessed the girl getting into the defendant's car and became suspicious. She approached and asked the defendant if he knew the girl, and he answered that he did. Williams asked the girl, who reportedly looked nervous, if she knew the defendant and she answered that she did not. Williams shouted at the girl to get out of the defendant's car and scolded her. The girl began to cry, and Williams called the police. The defendant remained at his car, which Williams blocked in with her own, until they arrived.

Officer Terry arrived at the scene and questioned Gilkeson. He asked the defendant for identification and questioned what he was doing in the area. The defendant stated that he was headed to Carousel Mall. When asked why he exited Route 81 before the mall exit defendant explained that he wanted to go the Dunkin Donuts and that he was familiar with the area. That seemed strange to the officer since the defendant had just purchased a snack at the convenience store. Officer Terry also thought it was unusual for the defendant, a caucasian, to be in that particular Syracuse neighborhood.

Officer Terry then spoke with two witnesses. Williams related her account of the events and Mr. Jerry Searight "basically related the same story." (Docket No. 26, Suppression Hearing Transcript ("Tr.——".) p. 13.) Officer Terry took the defendant into custody and delivered him to the Criminal Investigation Unit ("CIU") at the Syracuse Police Station. The defendant claims he waited for a few hours, handcuffed to a floor rail, before he was questioned. He twice asked for a lawyer and described the officer's response as, "So what, you know, is their attitude. I

2. Gilkeson holds an associate's degree and is certified in vocational education. As a student he made the Dean's List and maintained a 3.5 grade-point average. He has held several types of jobs, including tool and dye maker and project manager for a telecommunication company.

don't know what to do in a situation when you ask somebody for a lawyer and they don't get you one. I've never been in trouble before." (Tr. 103.)

Around 1:00 or 1:30 p.m., Detective Finnerty, a detective with the Abused Persons Unit ("ABU"), took the defendant next door to the ABU and began the interview by reviewing a *Miranda* form. He claims that he read each portion of the form out loud to the defendant, asked him if he understood what was read, and had him initial the appropriate part of the form. Gilkeson contends that he was never walked to a room at ABU, but signed and initialed the form while handcuffed in the first room where he was held.[3]

Gilkeson claims that he didn't talk to Detective Finnerty about a lawyer and didn't read the waiver, but signed the form because he was frustrated that he was tied down to a floor rail: "I would have done anything to get the hell out of there. I was just fit to be tied. Nobody has ever tied me down before." (Tr. 126.) The defendant initialed after each one of five sentences on a standardized form and signed at the bottom. He also signed consent forms permitting DNA testing and the search of his car.

The questioning continued for a few hours, with breaks, as the information came in to the station. According to the testifying detectives Gilkeson was not handcuffed and was offered something to drink and bathroom breaks. After this round of questioning he was returned to the blue room—so named for the color of its carpeting—in CIU, where the remainder of the questioning took place. The blue room is approximately twelve-by-twelve feet in dimension, contains a table and chairs, a two-way mirror, and sound capabilities. The questioning continued for a

few more hours with more breaks and offers of food and drink. At one point the defendant was provided with some food from Burger King, but he declined to eat it.

During his interview with Detective Finnerty, Gilkeson revealed that he regularly viewed pornography on his computer. Thus, at some point in the evening, detectives drove to Kirkland to visit the defendant's mother and gather information regarding the computer at the mother's house where the defendant lived. Detective Finnerty presented the defendant with a consent to search form as to that residence, which the defendant refused to sign. The defendant maintains that he refused, at least in part, because he didn't know if he could sign it for his mother's house and again asked for a lawyer. (Tr. 109.) Detective Finnerty concluded his interview with the defendant around 8:30 p.m., at which time Detective DeJoseph took over.

Detective DeJoseph interviewed the defendant for approximately seven and one-half hours from 8:30 p.m. Saturday evening until 4:00 a.m. Sunday morning. According to the detective, the interview was continuous for about three or four hours and then there were breaks every hour or so after that, during which the defendant was offered bathroom breaks and food. Detective DeJoseph describes the defendant as cooperative, inquisitive and talkative. On cross-examination he described the interview as follows:

> Q: Did [the defendant] ever say he didn't want to talk to you any longer or he wanted an attorney?
>
> A: No, sir, he didn't.

---

**3.** Lt. Thompson, the command officer of the Family Services Division of the Syracuse Police Department, which oversees the ABU, testified that the questioning took place at ABU, and that she witnessed the *Miranda* part of the interview in that room.

Q: Did you ever yell and scream at him during this interview? A: No, I did not.

. . . . .

Q: Was he ever uncooperative with you during the interview?

A: I think towards the later portions of the interview.

Q: Give us a time.

A: About four in the morning when I ceased the interview. I think he became tired and distracted and didn't want to speak to me anymore.

Q: Did he ever ask for a lawyer?

A: No.

Q: At any time during your interview, did he ever ask for a lawyer?

A: Not during my interview.

(Tr. 67, 77.)

Gilkeson describes the interview differently. He claims that Detective DeJoseph screamed at him throughout the interview, at one point directly in his face. He added:

A: [DeJoseph] came in with the paperwork that Finnerty had and ripped it up, and said you are not going anywhere, and I said I want to talk to a lawyer. And then he walked out of the room again. Then he came back in, and we just kept going on as if I never said a thing.

Q: What did he say and what did you say?

A: That's pretty much it. I mean, what else—that was the stage that was set. Finnerty brought in this, I believe to be, my charge which I had never been told up until that point yet, and he brought it in. DeJoseph—Finnerty brought it in to DeJoseph, and DeJo-

seph just tore it up and said you are not going anywhere.

(Tr. 107.)

As the interview proceeded it became clear to Detective DeJoseph that the computer the defendant used to view pornography was not located at Gilkeson's mother's house. The defendant ran his businesses at a property with a building, referred to as a barn, in which he kept an office. Detective DeJoseph asked the defendant to consent to a search of the computer in the barn, and the defendant was provided with a standardized consent to search form listing the relevant address and search information. The defendant also provided information as to how to gain entry to the barn. Detective DeJoseph testified that the defendant signed the form at approximately 11:30 p.m. on August 13, 2003.

Gilkeson claims that he signed the consent form at approximately 11:00 p.m. Sunday night, August 14, 2003, and that he did not eat or have anything to drink prior to signing. He adds that when Detective Finnerty first presented the form, he refused to sign and said that he wanted a lawyer. (Tr. 110–11.) He claims Detective Finnerty left with the form and Detective DeJoseph brought it back into the room.[4]

A: ... He was very irate with me. He had this attitude that I was going to rape and kidnap this little girl, and that he had a little girl. In fact, he explicitly told me and screamed within two inches of my face that the name of the mall is Carousel Mall, and I am going to follow this up with a vengeance thinking of my little girl.

**4.** Gilkeson claims that he eventually signed the form in the presence of Detective Finner-

ty, not Detective DeJoseph. (Tr. 137–38.)

Q: So why did you sign [the consent form]?

A: Well, after two days of not eating or drinking or sleeping, I couldn't discern right from wrong. I figured, well, God, if these guys could get a search warrant anyway, what hope do I have of holding back. I have to sign this. It doesn't matter. I wanted to be cooperative. The whole thing was to be cooperative and get this over with. I didn't know the laws. I only had my computer for one year. I didn't know what was going on, but I just wanted to be cooperative.

Q: Did anybody respond to your request for a lawyer?

A: No. That's the whole thing that irks me about this whole thing.

(Tr. 111–12.)

In light of the consent to search form, officers drove back to Kirkwood Sunday afternoon to retrieve the computer from the barn. Officer Munroe, another detective in the CIU, testified that the search occurred at approximately 2:30 p.m. Later, Officer Munroe made a mirror copy of the hard drive on defendant's Dell Dimension 2400 computer. According to the government, a forensic examination of the mirrored hard drive revealed images of minor children engaging in sexual conduct.

### B. Factual Determinations

There are two factual questions to be determined. First, in order to be clear about the circumstances of the interrogation, the time at which the defendant signed the consent form will be determined. Second, as the defendant claims his repeated requests for an attorney were ignored, and both Detectives Finnerty and DeJoseph aver that the defendant never requested an attorney, it must be determined whether the defendant requested an attorney and his requests were ignored.

█ The determinations turn almost entirely on credibility assessments. As ju-ries are regularly instructed, there is no magic formula for determining how much weight to give the testimony of a particular witness, or how to credit testimony which contains discrepancies. If a witness has testified falsely as to any material fact, the entire testimony of that witness may be disregarded upon the principle that one who testifies falsely about one material fact is likely to testify falsely about everything. However, such a witness need not be found totally unworthy of belief. A factfinder may accept so much of the such testimony as believed to be true, and disregard what is believed to be false.

### 1. Signing of the Consent Form

The defendant claims that he signed the consent form at 11:00 p.m. on Sunday, August 14, 2005. Detective DeJoseph claims that the defendant signed the consent form at 11:30 p.m. on Saturday, August 13, 2005. Neither the defendant's nor Detective DeJoseph's testimony may be credited in whole.

Gilkeson's testimony suffers several defects and inconsistencies. The most obvious example is the fact that he avers that he signed the consent form at a time after which he had already been booked and transferred from the police station. On the issue of the timing of the signing of the consent form, the defendant is simply not credible.

These discrepancies however, do not require that his entire testimony must be discredited. He displayed a formidable nature and considerable self-confidence during his testimony. His demeanor while testifying supports his stated reaction to being arrested and spending time in handcuffs. The defendant was no doubt "fit to be tied" at that perceived affront to his autonomy. This, at least in part, contributed to his apparent inability to maintain a

proper sense of time, and perhaps location, during the course of his interrogation.

The testimony of Detective DeJoseph, the most important regarding the issue here, also suffers deficiencies. The deficiencies fall under the assessment categories of reasonableness and common sense and are likely the product of self interest. There are significant reasons to doubt his statement that the defendant signed the consent form at 11:30 p.m. Saturday, August 13, 2005.

First, the standardized consent to search form bears two signatures, the defendant's and the witnessing officer's. Gilkeson's signature is followed by the date "8–14–05" and Detective DeJoseph's by the date "8–13–05". The testimony regarding the reason for the discrepancies is, of course, conflicting. (Tr. 75–76, 85, 88–89, 108–09, 135.) It is also relevant that the time of day is not marked on the form. It is noted that the discrepancy at issue here implicates both the constitutional rights of citizens and the government's ability to use evidence in prosecuting an alleged danger to society. Questions of error and/or intentional misrepresentation on the part of the government are unacceptable.

Detective DeJoseph testified that the defendant signed the consent form shortly before he ended the interrogation and that he ended the interrogation at 4:00 a.m. in the morning. The signing of the consent form would mark a logical point to end the questioning. A contrary determination would require finding that the consent was signed at 11:30 p.m. and Detective DeJoseph continued to question the defendant for five more hours into the morning ending the interview at some arbitrary and undefined point.

Furthermore, Detective DeJoseph undermined his own credibility in testifying that he never raised his voice during the interview with the defendant. Detectives are permitted to raise their voice, address diverse subjects, and exhibit a variety of emotions, including anger, in an effort to coax information from a suspect. It is simply not credible that Detective DeJoseph never raised his voice or demonstrated anger during the interrogation of the defendant, whom he believed to be a pedophile. Moreover, the defendant's testimony on the issue of Detective DeJoseph's conduct was credible.

It is determined that the Gilkeson signed the consent form at or about 4:00 a.m. on Sunday morning, August 14, 2005, just before Detective DeJoseph concluded his interview.

### 2. *Gilkeson's Requests for an Attorney*

The defendant claims that, after receiving *Miranda* warnings, he requested an attorney three times in response to specific events in the course of the interrogation: (1) when he was asked to sign the consent form to search his mother's home; (2) when Detective DeJoseph began the interrogation by tearing up a copy of the charges; and (3) when he was first presented with the consent to search form regarding the barn computer.[5] The detectives maintain that the defendant never asked for an attorney.

Despite the defendant's confusion regarding the passage of time during his interrogation, on the issue of his requests for an attorney, the defendant was credible. Both his temperament and level of education support the likelihood of his assertions. But, the most convincing aspect

---

**5.** Actually, he made five requests, considering the two made prior to his receiving *Miranda*

warnings and the commencement of the interrogation.

of his account is his portrayal of the officer's reaction to his requests.

After Detective DeJoseph tore up the defendant's paperwork, the defendant asked for an attorney and the detective left the room without responding to the request. When the detective returned to room, the interview was continued as if the defendant had never made the request.[6] By simply behaving as if they did not hear the request, the police seemingly avoided their obligation to discontinue questioning without overtly denying the defendant's request. There is no apparent reason for the defendant to fabricate such a scenario—one that seemingly serves the interests of the police because it does not demonstrate any affirmative denial of his request.

It is determined that Gilkeson requested an attorney more than once and his requests were ignored. Moreover, the requests were ignored in a calculated manner in an attempt to confuse the defendant and/or to undermine his understanding of the effect of his assertion of his right to counsel.

## III. *CONCLUSIONS OF LAW*

### A. *Probable Cause*

■■■■ Gilkeson asserts that the evidence seized pursuant to his signed consent form must be suppressed because it followed from an illegal arrest. He contends that Officer Terry lacked probable cause to arrest him. "Probable cause to arrest exists where the facts and circumstances are sufficient 'to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested.'" *Rothstein v. Carriere*, 373 F.3d 275, 292 (2d Cir.2004) (quoting *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir.1983)). "Courts

evaluating probable cause for an arrest must consider those facts available to the officer at the time of the arrest and immediately before it." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996). "Further, the existence of probable cause is to be determined on the basis of the totality of the circumstances." *Kent v. Katz*, 312 F.3d 568, 576 (2d Cir.2002) (citing *Illinois v. Gates*, 462 U.S. 213, 230–32, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

■■■ Defendant offers several arguments to defeat a finding of probable cause. He first argues that based on the information that Officer Terry had at the time of the arrest, it was not reasonable to believe that a crime was committed. The defendant was arrested for violating N.Y. Penal Law § 260.10, Endangering the Welfare of a Child, which provides: "A person is guilty of endangering the welfare of a child when . . . [h]e knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old." Defendant argues that the facts were not sufficient to support an inference of any intent to be injurious to the child. However, "in order to establish probable cause, it is not necessary to make 'a prima facie showing of criminal activity' or to demonstrate that it is more probable than not that a crime has been or is being committed." *United States v. Cruz*, 834 F.2d 47, 50–51 (2d Cir.1987) (citing *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir.1983)). The standard is whether the facts and circumstances warrant a person of reasonable caution to believe that an offense has been or is being committed. *Rothstein*, 373 F.3d at 292.

---

6. With less clarity, Gilkeson explained the detective's reaction to his third request in same way. When presented with a consent form to search his barn, he requested an attorney and the detective left the room. After the third request, he claims that the other detective returned with the form and proceeded with the interview.

■ Here, Officer Terry had evidence that Gilkeson encouraged a nine-year-old girl, whom he did not know, to get into his car. Williams told him that the defendant claimed to have known the girl, yet the child stated that she did not know him. The defendant's reasons for being in the neighborhood were not consistent with his stated reasons for being in the city—to visit the Carousel Mall. The combination of the girl's presence in his car and his inconsistent statements were sufficient to warrant Officer Terry's belief that the defendant acted in a manner likely to be injurious to the girl.

■ Gilkeson complains that Officer Terry was suspicious of defendant's presence in the neighborhood because he was a white man in a "black" neighborhood. He argues that if the element of race is removed, there was nothing unusual about the girl getting into his car. This argument is rejected. If the consideration of race was the basis for his arrest, his allegation would be true. But here, not only was race not the sole factor in the arrest, it was not a significant factor.[7] However racial considerations may have colored the officer's impression of the situation, probable cause existed regardless of any such impression.

■ Defendant also provides alternative explanations for several of facts relied on in finding probable cause. For example, he explains that in instructing the girl to get into his car, he was trying to help, not injure, the child considering her struggle with her grocery bags and the burn on her leg. However, "facts ostensibly sufficient to establish probable cause for an arrest are not negated simply because such facts also may be consistent with the suspect's innocence." *United States v. Webb*, 623 F.2d 758, 761–62 (2d Cir.1980) (citing *United States v. Rodriguez*, 532 F.2d 834, 838 (2d Cir.1976)). "In short, while the rule of probable cause does impose a requirement on police to act with more than mere suspicion of wrongdoing, the rule also gives police a permit to act with less than absolute certainty of guilt." *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). "In dealing with probable cause ... as the very name implies, we deal with probabilities ... The standard of proof is accordingly correlative to what must be proved.". The defendant's alternative explanations do not negate the finding of probable cause.

■ Finally, Gilkeson argues that Officer Terry should have made a further inquiry into the situation before arresting him. He complains that the officer did not speak with him again after talking with the witnesses at the scene. This contention is also rejected. "The officer was not required to make a full investigation into plaintiff's state of mind prior to taking action. Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 128 (2d Cir.1997); *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir.2001).

Officer Terry had probable cause to arrest the defendant. The motion to suppress the fruits of the later search based on grounds that it followed an illegal arrest must be denied.

---

7. [A]lthough race or color alone cannot serve as a basis for making an investigatory stop, "racial appearance may be considered as a factor contributing to a founded suspicion of criminal conduct." *United States v. Blanton*, 1998 WL 783948, *1, 1998 U.S.App. LEXIS 28418, at *2–3 (9th Cir.1998) (citing *United States v. Fouche*, 776 F.2d 1398, 1402–03 (9th Cir.1985), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988)).

## B. *Miranda–Edwards Violation*

It has been determined that Gilkeson requested an attorney three times during his interrogation and that his requests were ignored. This finding raises the legal issue of the effect of such a *Miranda* violation.

 There is no question as to whether or not the defendant's requests for an attorney were equivocal. Nor is there a question of a subsequent *Miranda* waiver.[8] It is clear that any statements the defendant made after his request for counsel would be suppressed. But, there is an issue of derivative evidence. The defendant revealed incriminating information— the existence and location of the computer in his barn office—after his requests for an attorney were ignored. The continuing interrogation provided fruitful information which led the filing of separate and distinct federal charges.

 As a preliminary matter, it is noted that the consent to search in this case will be treated as the fruit of a *Miranda* violation along with the physical evidence obtained pursuant to the consent. Generally, consents to search are considered for their validity which turns on whether the consent was given voluntarily. *See United States v. Kon Yu–Leung*, 910 F.2d 33, 40–41 (2d Cir.1990) ("[T]he consent to search should be deemed valid if, given the totality of the surrounding circumstances, the consent was voluntarily given, and not the product of duress or coercion."). Indeed, most circuits have held that this standard applies even if the individual's consent follows a *Miranda* violation because "a request for consent to search does not constitute an interrogation within the meaning of *Miranda* insofar as it does not seek to elicit a self-incriminating statement." *United States v. St. Claire*, No. 04–CV–147, 2005 WL 736236, *4, 2005 U.S. Dist. LEXIS 5262, at *12 (S.D.N.Y. March 30, 2005); *United States v. Shlater*, 85 F.3d 1251, 1256 (7th Cir.1996); *United States v. Rodriguez–Garcia*, 983 F.2d 1563, 1568 (10th Cir.1993) ("Every federal circuit court which has addressed the *Miranda* issue presented here has reached the conclusion that a consent to search is not an incriminating statement." (collecting cases)).[9]

This case is different because, unlike most consents to search, the consent to search in this case cannot be separated from the *Miranda* violation. Cases where consents to search are upheld despite *Miranda* violations are consents requested based on information the police had prior to the individual's consenting. *See St. Claire*, 2005 WL 736236, *3, 2005 U.S. Dist. LEXIS 5262 at *8 (consent given to search the apartment when police were at the individual's door); *Shlater*, 85 F.3d at 1256 (individual had told the police about the evidence at his house at the time of his

---

**8.** "[A] valid waiver ... cannot be established by showing only that he responded to further police-initiated custodial interrogation." *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Further, there is no assertion that the defendant initiated conversation with the officers after he requested an attorney thereby effectively waiving his *Miranda* right to counsel.

**9.** Not all courts agree however:
A request to search, while it may not always lead to a testimonial self-incriminating statement, nevertheless seeks "self-incrimi-

nating" information from the suspect by the "testimonial action" of the defendant, to whit: signing the consent form, something that requires the advice of counsel as much as answering any question directly put to the subject ... [T]he law enforcement officer is clearly exceeding his or her authority in proceeding further by additional questioning or asking the individual to give up certain substantive rights by signing consent forms.
*United States v. Fleming*, 31 F.Supp.2d. 3, 6 (D.D.C.1998).

apprehension—before he invoked his right to counsel and consented to the search of the house); *Rodriguez–Garcia*, 983 F.2d at 1566 (pre-arrest surveillance revealed the locations searched pursuant to the consent).[10]

In such cases, the courts hold that *Miranda* is not violated because the consent itself is not an incriminating statement; thus there are no incriminating statements involved and the Fifth Amendment is not implicated. But here, there are incriminating statements at issue. Gilkeson made inculpatory statements—referring to the existence and use of a computer at a location previously unknown to the police—and the consent was requested and received based on the information which was obtained in violation of *Miranda*.[11]

Accordingly, the issue here is whether the *Miranda* violation—the continuation of police interrogation after the defendant's repeated requests for an attorney—requires that the derivative evidence found on his computer be suppressed under the fruit of the poisonous tree doctrine.

### 1. *Miranda*

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. The on-going struggle in balancing that right and society's interest in criminal investigation and prosecution was punctuated in 1966 in the Supreme Court case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Courts had been collectively struggling with applying a totality-of-the-circumstances test when determining whether an individual's custodial statements were voluntary and thus admissible, or involuntary and thus inadmissible, at trial. *See Michigan v. Tucker*, 417 U.S. 433, 441, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). In *Miranda*, the Court attempted to draw bright lines for considering statements made during police custodial questioning, in order to protect the ability of suspects to invoke their Fifth Amendment rights and to provide clear guidance to courts and police. 384 U.S. at 442, 86 S.Ct. 1602.

The *Miranda* Court concluded that the constitutional privilege against self-incrimination required the creation of prophylactic procedural safeguards for use during interrogation. *Id.* at 467, 86 S.Ct. 1602. The safeguards require that a person in police custody "must be warned prior to

---

**10.** This is also true in the other circuit court cases oft relied on for this proposition. *See United States v. Faruolo*, 506 F.2d 490, 495 (2d Cir.1974) (individual consented to search of his home while police were at his home pursuant to a tip and surveillance); *United States v. Taylor*, 2000 WL 6146, **1–2, 2000 U.S.App. LEXIS 106 at *4 (4th Cir.2000) (individual was investigated for embezzlement and the consent to search was given to search his banks records); *Smith v. Wainwright*, 581 F.2d 1149, 1152 (5th Cir.1978) (individual arrested at the scene of a traffic accident and the consent to a search pertained to the truck driven during the accident); *United States v. Cooney*, 26 Fed.Appx. 513, 523 (6th Cir.2002) (individual arrested at her house consented to search of the house); *United States v. Glenna*, 878 F.2d 967, 969 (7th Cir.1989) (consent to search given to search a van during a traffic

stop which resulted in arrest); *Cody v. Solem*, 755 F.2d 1323, 1330 (8th Cir.1985) (out-of-state arrestee consented to the search of his local hotel room where police had knowledge of the room before the consent was given); *United States v. Lemon*, 550 F.2d 467, 469 (9th Cir.1977) (hotel keys found on arrestee during pat-down and the consent to search pertained to the hotel room); *United States v. Hidalgo*, 7 F.3d 1566, 1568 (11th Cir.1993) (individual arrested at his house consented to search of the house).

**11.** *But see United States v. McClellan*, 165 F.3d 535, 544 (7th Cir.1999) (willing to separate the consent despite the potentially fruitful interrogation conducted after the *Miranda* invocation of right to counsel and before the consent to search).

any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479, 86 S.Ct. 1602. These *Miranda* rights may be waived, "[b]ut unless and until such warnings and waiver are demonstrated by the prosecution at trial, *no evidence obtained as a result of interrogation can be used against him.*" *Id.* (emphasis added).

■ *Miranda* protects by creating a presumption of coercion, and thus inadmissibility, for statements made during custodial interrogations in the absence of warnings. The presumption is irrebuttable for purposes of the prosecution's case in chief. *United States v. Patane,* 542 U.S. 630, 639, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004). Thus, post-*Miranda,* an individual's trial privilege against self-incrimination was to be protected by an exclusionary rule.[12] As the Court explained:

> The *Miranda* exclusionary rule ... serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself ... Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda.*

*Oregon v. Elstad,* 470 U.S. 298, 306–307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).[13]

■ While even voluntary statements will be excluded from evidence if they are deemed unwarned, "the *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted" for all other purposes. *Id.* at 307, 105 S.Ct. 1285. Thus, the question becomes: Under what circumstances will statements—and their fruits—taken in violation of *Miranda* be subject to its exclusionary rule?

## 2. *Miranda's Progeny*

*Miranda* did not provide the bright lines the Court had envisioned. In the years after its decision, the Court has narrowed *Miranda's* exclusionary sweep and consequently blurred the lines of guidance to police and the courts. As the brief review of *Miranda's* progeny will demonstrate, when faced with questions of admissibility of statements—and the fruits of such statements—taken in violation of *Miranda,* the Supreme Court will not extend *Miranda's* protection through application of the exclusionary rule absent a triggering of *Miranda's* rationales—the trustworthiness of evidence and/or the deterrence of police misconduct. *See Elstad,* 470 U.S. at 309, 105 S.Ct. 1285 (1985); *Tucker,* 417 U.S. at 448, 94 S.Ct. 2357. Moreover, the Court weighs the application of *Miranda* in the context of other judicial objectives.

---

**12.** The exclusionary rule is best known in connection with the suppression of evidence secured by an illegal search and seizure, but it applies also to statements made in connection with an illegal arrest, to confessions obtained involuntarily or during a period of unnecessary delay in bringing an arrested person before a magistrate or at a time when the *Miranda* warnings have not been given, to identifications that are improperly made, and to evidence obtained by illegal electronic surveillance.

2A Charles Alan Wright, *Federal Practice and Procedure* § 408 (3d ed. Supp.2005).

**13.** "Thus, in the individual case, *Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm." Elstad, 470 U.S. 298, 306–307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (citing *New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), *Tucker,* 417 U.S. at 444, 94 S.Ct. 2357).

■ "Evidence is admissible when the central concerns of *Miranda* are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction." *Missouri v. Seibert*, 542 U.S. 600, 618–619, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (Kennedy, J., concurring). For example, in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), the Court found that the *Miranda* rule gives way to protect countervailing concerns of public safety. There, the police "were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket." *Id.* at 657, 104 S.Ct. 2626. "[T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* Thus, unwarned inculpatory statements were not subject to *Miranda's* exclusionary rule.

Another example of an overwhelming countervailing objective—unchecked perjury—was revealed in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). In both cases the Court approved of the prosecution's use of statements taken in violation of *Miranda*.[14] The Court found that the inculpatory statements were admissible to impeach the defendants' trial testimony in order to prevent the defendant from using "the illegal method by which

evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths." *Harris*, 401 U.S. at 224, 91 S.Ct. 643 (quoting *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954)). "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Hass*, 420 U.S. at 722, 95 S.Ct. 1215. Again, the *Miranda*-offending statements were not subject to *Miranda's* exclusionary rule because "inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth." *Id.* at 723, 95 S.Ct. 1215.

Absent any extraordinary judicial objectives, like those just noted, the ordinary prosecutorial need for the evidence will overwhelm arguments of inadmissability if *Miranda's* rationales are not implicated. In *Michigan v. Tucker*, 417 U.S. 433, 437, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), the arrestee, without having received full *Miranda* warnings, revealed the identity of a witness who later testified against him at trial. The defendant argued that the identity of the witness was the fruit of unwarned statements and was inadmissible. *Id.* at 447, 94 S.Ct. 2357. The Court held that the witness' testimony was admissible. The circumstances of the defendant's custody did not concern the sort of police conduct *Miranda* sought to deter and, therefore, did not justify exclusion based

14. In *Harris* the violation was the failure to provide *Miranda* warnings. 401 U.S. at 224, 91 S.Ct. 643. In *Hass*, the statements were made after the individual had requested an attorney but had not yet been provided with one. 420 U.S. at 715, 95 S.Ct. 1215. Hass requested an attorney during the drive to the police station for questioning. *Id.* He was told that an attorney could not be provided

until they reached the station. *Id.* During the ride he made incriminating statements which revealed the location of evidence. *Id.* at 715–16, 95 S.Ct. 1215. *Hass* is distinguishable from the instant case in the manner and denial of the request for counsel. But also, it does not involve the use of testimony for impeachment purposes and therefore lacks the compelling-countervailing-interest factor.

on the deterrence rationale. *Id.* at 449, 94 S.Ct. 2357. Moreover, considering that the testimony was given by a third-party witness, the trustworthiness of the trial testimony was not implicated.[15] *Id.*

The Court has maintained this approach to extending *Miranda* when called upon to consider the application of the "fruit of the poisonous tree doctrine" ("fruit doctrine") to bar evidence obtained in violation of *Miranda.* Accordingly, if *Miranda's* rationales are not implicated, the fruit doctrine will not apply to preclude the admission of *Miranda*-offending evidence.

The fruit doctrine, most often articulated and applied in the Fourth Amendment context, is an exclusionary rule which "has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In *Wong Sun,* the Supreme Court quoted Justice Holmes in explaining the doctrine:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

*Id.* at 484–485, 83 S.Ct. 407 (quoting *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920)).[16]

In the Fourth Amendment context the sole purpose of the exclusionary rule is to deter future unlawful police conduct. *Tucker,* 417 U.S. at 446, 94 S.Ct. 2357 (quoting *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). As the Court explained: "Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Id.* (quoting *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669(1960)).

The application of the fruit doctrine in the Fifth Amendment context, more specifically the *Miranda* context, is more complicated.[17] "The exclusionary rule, ... when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth." *Brown v. Illi-*

---

**15.** "The Court has often noted: '[A] living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized ... [The] living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give.'" *Elstad,* 470 U.S. at 308–309, 105 S.Ct. 1285 (quoting *United States v. Ceccolini,* 435 U.S. 268, 277, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978)).

**16.** There is no issue of knowledge of the evidence or inevitable discovery in this case. At the suppression hearing it was noted that "it has been agreed that if there was not a valid search, since the results of the warrantless search[ ] formed the basis for the two search warrants, [the subsequent warrants issued in this case] would not be valid." (Tr. 4.)

**17.** It is worth noting, however, that the Fifth Amendment privilege against compelled self-incrimination clearly extends to exclude derivative evidence outside the *Miranda* context. *See Patane,* 542 U.S. at 646, 124 S.Ct. 2620 (citing *United States v. Hubbell,* 530 U.S. 27, 37–38, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000) (recognizing the Fifth Amendment's protection against the prosecutor's use of incriminating information derived directly or indirectly from ... [actually] compelled testimony)); *Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

*nois,* 422 U.S. 590, 600–02, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Any blanket suppression rule in the *Miranda* context must meet the Court's close-fit requirement between the Self–Incrimination Clause and its application to protect it. *Id.* at 640, 95 S.Ct. 2254. Moreover, violations of the Fourth Amendment have traditionally mandated a broad application of the fruit doctrine. *Elstad,* 470 U.S. at 306, 105 S.Ct. 1285. But, there is a presumption against expanding the exclusionary aspect of the *Miranda* rule beyond the exclusion of evidence in the prosecution's case in chief. *See Patane,* 542 U.S. at 639, 124 S.Ct. 2620.

In *Oregon v. Elstad,* the Court considered whether the fruit doctrine would apply to preclude admission of statements that were the fruit of pre-warned statements. 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). The police visited Elstad's home to investigate a recent burglary. *Id.* at 301, 105 S.Ct. 1285. During a brief initial questioning, Elstad revealed that he was at the burglary, so officers decided to take him to the police station. *Id.* At the station, he was provided with proper *Miranda* warnings and gave a full statement regarding his involvement in the crime. *Id.* Later he "contended that the statement he made in response to questioning at his house 'let the cat out of the bag,' and tainted the subsequent confession as 'fruit of the poisonous tree.'" *Id.* at 302, 105 S.Ct. 1285 (internal citations omitted).

The Supreme Court declined to apply the fruit doctrine to suppress the post-warned statements:

> The failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised ... In these circum-stances, a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an "act of free will."

*Elstad,* 470 U.S. at 310–311, 105 S.Ct. 1285 (quoting *Wong Sun,* 371 U.S. at 486, 83 S.Ct. 407).

The *Elstad* holding turns on the "curing" of the *Miranda* violation. In a sense, the court holds that *Miranda* was not actually violated as the protection was provided in full after all by the subsequent warning. But also, "[a]s in *Tucker,* the absence of any coercion or improper tactics undercut[ ] the twin rationales—trustworthiness and deterrence—for a broader rule. Once warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." *Elstad,* 470 U.S. at 308, 105 S.Ct. 1285. There was no indication of police misconduct in *Elstad.* Rather, the court explained that the failure to give the *Miranda* warnings was an oversight. Once again, the scope of *Miranda's* exclusionary rule was not extended where its original rationales were not implicated.

The Court recently addressed the issue of the application of the fruit doctrine in another factual context in *United States v. Patane,* 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004). In *Patane,* the defendant was arrested for harassing his ex-girlfriend, and a restraining order was issued. *Id.* at 634, 124 S.Ct. 2620. While the matter was under investigation it came to the attention of the local police department that the defendant, a convicted felon, illegally possessed a Glock pistol. *Id.* Two officers went to Patane's residence to question him about violating the restrain-

ing order and the discussion culminated in an arrest. *Id.* at 635, 124 S.Ct. 2620. The officer "attempted to advise [Patane] of his *Miranda* rights but got no further than the right to remain silent. At that point, [Patane] interrupted, asserting that he knew his rights, and neither officer attempted to complete the warning." *Id.* When asked about the Glock, Patane was reluctant to answer but eventually told an officer that the pistol was in his bedroom. *Id.* The gun was retrieved and the government offered it at trial on charges for possession of a firearm by a convicted felon. *Id.*

The issue before the Court was whether the gun should have been suppressed as the fruit of an unwarned statement. *Id.* The Court determined that the exclusionary rule did not apply to bar the introduction of the gun. The *Patane* plurality began by reaffirming the close-fit requirement between the Self–Incrimination Clause and any application of a suppression rule proposed to protect it and determined that here there was not a close fit. But the Court focused its analysis on the inapplicability of the deterrence rationale. *Id.* "[U]nlike unreasonable searches under the Fourth Amendment or actual violations of the Due Process Clause or the Self–Incrimination Clause, there is, with respect to mere failures to warn, nothing to deter. There is therefore no reason to apply the 'fruit of the poisonous tree' doctrine of *[Wong Sun]."* *Id.* at 642, 124 S.Ct. 2620.

▆▆▆ The conclusion that there is "nothing to deter" is based on the premise that "a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule." *Id.* at 641, 124 S.Ct. 2620. The

Supreme Court cited the plurality and concurring opinions in its recent decision *Chavez v. Martinez,* 538 U.S. 760, 772, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003), for this proposition. *See* Yale Kasimer, *Postscript: Another look at Patane and Seibert, The 2004 Miranda Poisoned Fruit Cases,* 2 Ohio St. J.Crim. L. 97, 97–98 (2004) (opining that the reliance on *Chavez* in *Patane* was misplaced). The *Chavez* Court held that the failure of an officer to read an individual his *Miranda* rights could not be the grounds for a civil action under 42 U.S.C. § 1983.[18] *Chavez,* 538 U.S. at 772, 123 S.Ct. 1994. This is because the *compulsion* of incriminating statements is not a violation: it is *admitting* the compelled evidence at trial that constitutes a violation. *Id.* at 769, 123 S.Ct. 1994. Indeed, the arrestee in *Chavez* was never charged with a crime. *Id.* at 764, 123 S.Ct. 1994. Despite the *Patane* Court's reliance on *Chavez,* the *Chavez* Court did not address the issue of whether the *Miranda* rule was violated in that case, any other case, or what the exclusionary consequences would have been.

Beyond this ground for finding that the deterrence rationale did not apply, the facts of the *Patane* case do not implicate any of the traditional concerns of custodial interrogations. In fact, in *Patane,* it was the arrestee who "caused" the *Miranda* quandary by interrupting the reading of his *Miranda* rights and stating that he knew them. There was no indication of police misconduct. *Miranda's* application to assure the trustworthiness of evidence was not implicated either as his statements were indisputably voluntary. Again, since the facts did not suggest coercion or implicate the trustworthiness of the evidence the exclusionary rule was not applied to

---

**18.** This, of course, does not mean that there are no avenues for redress in circumstances of egregious custodial conduct. The *Chavez* court leaves the courthouse door open for

cases brought pursuant to the Fourteenth Amendment's Due Process Clause. *Chavez,* 538 U.S. at 773, 123 S.Ct. 1994.

bar the introduction of *Miranda*-offending evidence.

Finally, in a case raising a similar issue as that of *Elstad*—the admissibility of post-warning statements gained as a result of pre-warned statements—the Court did extend the *Miranda* exclusionary rule to *Miranda*-offending evidence outside the narrow category of statements used in the prosecution's case in chief.

In *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), *Miranda's* rationales were triggered. In *Seibert*, a police officer testified that he consciously withheld warnings pursuant to an interrogation technique called "question-first." *Seibert*, 542 U.S. at 606, 124 S.Ct. 2601. The technique involves questioning an arrestee until he or she gives an inculpatory statement, giving the warnings, and then repeating the questions until the officer gets the answer previously provided. *Id.* The Court had deemed the mid-stream warnings in *Elstad* sufficient to cure any *Miranda* violation, but found that the mid-stream warnings in *Seibert* did not suffice. The Court distinguished *Elstad* by noting that the police conduct at issue there was a mere oversight and in the end did not

diminish the effectiveness of the *Miranda* protections, in contrast with the *Seibert* interrogation.[19]

The [Elstad] Court, indeed, took care to mention that the officer's initial failure to warn was an "oversight" that "may have been the result of confusion as to whether the brief exchange qualified as 'custodial interrogation' or ... may simply have reflected ... reluctance to initiate an alarming police procedure before [an officer] had spoken with respondent's mother." At the outset of a later and systematic station house interrogation going well beyond the scope of the laconic prior admission, the suspect was given *Miranda* warnings and made a full confession.

*Seibert*, 542 U.S. at 614, 124 S.Ct. 2601 (quoting Elstad, 470 U.S. at 315–16, 105 S.Ct. 1285).

The Court found that the *Miranda* warning given to the arrestee in *Seibert* simply did not function effectively. "*Miranda* warnings ... inserted in the midst of coordinated and continuing interrogation, ... are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of

---

19. The circumstances of the *Seibert* interrogation were described as follows:

The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the Miranda warnings, he said nothing to counter the probable misimpression that the advice that any-thing Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used. Nothing was said or done to dispel the oddity of warning

about legal rights to silence and counsel right after the police had led her through a systematic interrogation, and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way Officer Hanrahan set the scene by saying "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. *Seibert*, 542 U.S. at 616–17, 124 S.Ct. 2601 (2004) (citation omitted).

his rights and the consequences of abandoning them.'" *Seibert*, 542 U.S. at 613–614, 124 S.Ct. 2601 (quoting *Moran v. Burbine*, 475 U.S. 412, 424, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). The post-warning statements were deemed inadmissible.

The holding in *Seibert* rested on both of *Miranda's* rationales: deterrence—"Strategists dedicated to draining the substance out of *Miranda* cannot accomplish by training instructions what *Dickerson*[20] held Congress could not do by statute"—and trustworthiness—the technique undermined the arrestee's knowledge and understanding of his constitutional rights. *Seibert*, 542 U.S. at 617, 124 S.Ct. 2601.

In summary, the previous caselaw demonstrates that the Court's willingness to extend *Miranda's* protection through application of the exclusionary rule beyond the use of evidence in prosecution's case in chief turns on the triggering of its rationales.

### 3. *Right to Counsel*

The aspect of the *Miranda* warnings involved in this case runs along a particular thread of jurisprudence tied together in the *Miranda* decision. Two years before *Miranda*, in *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the Supreme Court held a confession inadmissible where police had denied the defendant's request to speak to an attorney and prevented his attorney, who had come to the station, from consulting with him.[21] *Escobedo* was decided pursuant to the Sixth Amendment, and it sparked sharp debate regarding the application of the

Fifth and Sixth Amendments during interrogation. *Escobedo*, 378 U.S. at 491, 84 S.Ct. 1758.

 The *Miranda* Court reaffirmed its holding in *Escobedo*, but declined to attach the right to counsel during interrogation to the Sixth Amendment: instead, it tied the right to the Fifth Amendment and made it the subject of *Miranda's* procedural safeguards. *Miranda*, 384 U.S. at 442, 86 S.Ct. 1602. As the Court would explain later, the Fifth and Sixth Amendment rights to counsel serve different purposes. "The purpose of the Sixth Amendment counsel guarantee ... is to 'protect the unaided layman at critical confrontations' with his 'expert adversary,' the government, after 'the adverse positions of government and defendant have solidified' with respect to a particular alleged crime." *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (quoting *United States v. Gouveia*, 467 U.S. 180, 189, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)). "The purpose of the *Miranda-Edward's* guarantee, on the other hand ... is to protect a quite different interest: the suspect's 'desire to deal with the police only through counsel.'" *Id.* (quoting *Edwards*, 451 U.S. at 484, 101 S.Ct. 1880.)

This thread of protection is distinguishable from others in the *Miranda* context because the Court has augmented this aspect of *Miranda*. In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Court "established a second layer of prophylaxis for the *Miranda* right

---

**20.** Discussed infra page 290.

**21.** The circumstances of the *Escobedo* interrogation were described as follows:

The police did not effectively advise [Escobedo] of his right to remain silent or of his right to consult with his attorney. Rather, they confronted him with an alleged accom-

plice who accused him of having perpetrated a murder. When the defendant denied the accusation and said 'I didn't shoot Manuel, you did it,' they handcuffed him and took him to an interrogation room. There, while handcuffed and standing, he was questioned for four hours until he confess *Miranda*, 384 U.S. at 440, 86 S.Ct. 1602.

to counsel." *McNeil*, 501 U.S. at 176, 111 S.Ct. 2204.

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards*, 451 U.S. at 485, 101 S.Ct. 1880.

 Later, the Supreme Court fortified the protection in holding that the *Miranda–Edwards* protection is not offense specific; once the right to an attorney is invoked, the arrestee may not be questioned as to any crime. *Arizona v. Roberson*, 486 U.S. 675, 681, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). This is broader than the Sixth Amendment right to counsel which, once invoked, applies only to questioning regarding the charged offense. "This is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.'" *McNeil*, 501 U.S. at 177, 111 S.Ct. 2204 (quoting *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990)).

> If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be

> considered voluntary under traditional standards.

*Id.*

The right to counsel which arises during custodial interrogations has not only been afforded the procedural protections of *Miranda*, but those protections have been fortified at the same time that other aspects of *Miranda*, and even *Miranda* itself, have been a matter of some uncertainty.

### 4. *Dickerson*

It is necessary to pause briefly to consider the legal pedigree of the *Miranda* rule in order to evaluate the legal effect of violating it. In the background of *Miranda* cases, courts and scholars have struggled to categorize the *Miranda* protections in order to assign them the requisite legal effect. Indeed, the lack of legal clarity in the *Miranda* context is demonstrated by the split decisions in *Patane* (5–4 decision with plurality, concurring and dissenting opinions) and *Seibert* (5–4 decision with plurality, (two) concurring, and dissenting opinions).

If the *Miranda* rule is considered of the same legal authority as the constitutional rights its serves, there is little question as to the scope of its exclusionary rule. It would function broadly in the same way as the exclusionary rule in the Fourth Amendment context. But the *Miranda* rule was born of the Court, and the Court itself regularly refers to it as simply a "prophylactic rule." *Dickerson v. United States*, 530 U.S. 428, 437–38, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Over the years since *Miranda*, its applicability, if not viability, has been challenged regularly. *Id.* (Scalia, J. dissenting). In 2000, the issue of its legal underpinnings finally came before the Court in *Dickerson*.

Two years after *Miranda* was decided, Congress decided to abolish it and return

to the pre-*Miranda* totality-of-the-circumstances test for assessing the voluntariness and admissibility of custodial statements. *Id.* at 435, 120 S.Ct. 2326. It enacted 18 U.S.C. § 3501 to that effect, and the constitutionality of the statute was the issue addressed in *Dickerson.* The Court held that Congress lacked the constitutional authority to supercede *Miranda* because the *Miranda* protections are constitutionally required and not merely rules of evidence or procedure. *Id.* at 437, 120 S.Ct. 2326. Thus, the *Miranda* rule does not represent a constitutional right, but it is not just a prophylactic rule—it's a constitutional rule. Beyond telling Congress that it cannot supercede *Miranda, Dickerson* provides minimal guidance for making admissibility determinations.

The *Dickerson* Court did, however, reiterate that *Miranda* represents a minimum of the required constitutional custodial protections:

> The Court of Appeals [in upholding § 3501] relied in part on our statement that the *Miranda* decision in no way "creates a 'constitutional straightjacket.'" *See* 166 F.3d at 672 (quoting *Miranda,* 384 U.S. at 467, 86 S.Ct. 1602). However, a review of our opinion in *Miranda* clarifies that this disclaimer was intended to indicate that the Constitution does not require police to administer the particular *Miranda* warnings, not that the Constitution does not require a procedure that is effective in securing Fifth Amendment rights.

*Dickerson,* 530 U.S. at 440, 120 S.Ct. 2326. As the Court emphasized two years later in *Patane,* the "*Miranda* rule is not a code of police conduct." 542 U.S. at 637, 124 S.Ct. 2620. Indeed, the Court never prescribed a particular wording of the *Miranda* warning. *California v. Prysock,* 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981)("no talismanic incantation was required to satisfy [*Miranda's*]

strictures"). Moreover, the police are not required to give the *Miranda* warnings prior to all questioning just in case a confession is forthcoming.

The full portion of *Miranda* that the Court referred to in *Dickerson* above reads as follows:

> It is impossible for us to foresee the potential alternatives for protecting the privilege which might be devised by Congress or the States in the exercise of their creative rule-making capacities. Therefore we cannot say that the Constitution necessarily requires adherence to any particular solution for the inherent compulsions of the interrogation process as it is presently conducted. Our decision in no way creates a constitutional straitjacket which will handicap sound efforts at reform, nor is it intended to have this effect. We encourage Congress and the States to continue their laudable search for increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws.

*Miranda,* 384 U.S. at 467, 86 S.Ct. 1602.

Thus, in *Dickerson* the Court affirmed that *Miranda's* directives represent the bare minimum of protection to those subject to custodial interrogation. The Court is unable and unwilling to build upon its directives in *Miranda,* but those minimal directives are constitutional in nature and may not be altered by Congress, not to mention police strategists. *See Seibert,* 542 U.S. at 617, 124 S.Ct. 2601.

#### 5. *Gilkeson*

Whether the fruit doctrine should be applied to bar the introduction of evidence obtained from Gilkeson's computer—obtained after he asserted his right to counsel—turns on the presence of any countervailing judicial interests, the triggering of

*Miranda's* rationales and the nature of the *Miranda* violation at issue.

This case does not involve the extraordinary countervailing objectives implicated in *Quarles, Harris,* and *Hass.* The fact of the defendant's custody negates any implication of the public safety exception provided in *Quarles.* And, there is no question of using the evidence at issue to prevent unchecked perjury as in *Harris* and *Hass.* This case implicates the straightforward government interest in using the evidence in the government's case in chief.

The question of applying the fruit doctrine to *Miranda–Edwards* violations has been addressed and debated by the courts and scholars, but has not been considered by the Supreme Court. *See In re H.V.,* 179 S.W.3d 746, 759 (Tex.App.2005) (listing conflicting cases); Mark S. Bransdorfer, *Note, Miranda Right–to–Counsel Violations and the Fruit of the Poisonous Tree Doctrine,* 62 Ind. L.J. 1061 (1987) (concluding that such evidence should be inadmissible); Kasimer, *supra,* at 113 (concluding that such evidence would be held admissible by the current Court).

But the Court came close to the question at issue here in *Patane.* The Court stated that the *Miranda* rule's protection in the Self–Incrimination context is not implicated by the introduction at trial of physical evidence resulting from voluntary statements. *Patane,* 542 U.S. at 634, 124 S.Ct. 2620. But thereafter the Court explained that the police conduct in *Patane* not only did not violate the Constitution, it did not even violate the *Miranda* rule. Specifically: "[P]olice do not violate the Constitution (or even the Miranda rule, for that matter) by mere failures to warn. For this reason, the exclusionary rule articulated in cases such as *Wong Sun* does not apply." *Patane,* 542 U.S. at 637, 124 S.Ct. 2620. "There is, with respect to mere failures to warn, nothing to deter." *Id.* at 642, 124

S.Ct. 2620. Accordingly, *Patane* is not controlling here because the instant case involves a *Miranda–Edwards* violation, not a mere failure to warn. The difference is dispositive. The police conduct in this case clearly *does* violate *Miranda* and its progeny and implicates the deterrence rationale.

To say that *Miranda* does not operate as a prescribed code of conduct as the Court did in *Patane* and *Dickerson* is not to say that *Miranda* does not contain absolute prohibitions. *Miranda* and its progeny have treated the right to counsel during interrogation with a specific prescription—actually a prohibition. Once the right to counsel is invoked, officers must cease questioning:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Miranda,* 384 U.S. at 474, 86 S.Ct. 1602. The Court repeated the prescription in Edwards: "[A]n accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him." 451 U.S. at 484–485, 101 S.Ct. 1880. And again in Roberson:

> The *Edwards* rule thus serves the purpose of providing "clear and unequivocal" guidelines to the law enforcement

profession. Surely there is nothing ambiguous about the requirement that after a person in custody has expressed his desire to deal with the police only through counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 486 U.S. at 682, 108 S.Ct. 2093 (quoting *Miranda*, 384 U.S. at 484–85, 86 S.Ct. 1602); *Minnick v. Mississippi*, 498 U.S. 146, 151, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) ("The merit of the *Edwards* decision lies in the clarity of its command and the certainty of its application."). This clear prohibition against continued questioning is the minimum of police activity required to protect an arrestee's Fifth Amendment rights. This is exactly the minimum constitutional protection that was reaffirmed in *Dickerson*.

▪ In this case, the *Miranda–Edwards* violation is clear and the Court's prohibition was ignored. While there may be some play in the words of the *Miranda* warning or the timing of the warning, it could not be clearer that police must cease questioning once an arrestee invokes the right to counsel. If this aspect of the *Miranda* rule may be disregarded without consequence then the rule is of no avail.

Defendant Gilkeson asked for an attorney on three occasions and his requests were ignored. Where the Court has fortified its procedural safeguards in the *Miranda* context, a corresponding scope of the exclusionary rule is warranted. *See In re H.V.*, 179 S.W.3d at 760 (finding the distinction between accidently unwarned statements in *Patane* and a voluntary, post failure-to-honor-a-request-for-counsel dispositive, and holding that the fruits of such statements are inadmissible); *State v. Harris*, 199 Wis.2d 227, 248, 544 N.W.2d 545 (Wis.1996) (same).[22]

Furthermore, the apparent attempt to bypass the *Miranda* requirement in this case is akin the question-first conduct in *Seibert*, in which the plurality decision focused on the deterrence rationale.[23] Of course, the need for deterrence is not implicated by good-faith police conduct. Accordingly, the Court has only extended *Miranda*'s protection in *Seibert* where the police had deliberately sought to contravene its purposes. *See Seibert*, 542 U.S. at 610 n. 2, 124 S.Ct. 2601 (listing writings relating to various police practices related to *Miranda); see, e.g.,* Charles D. Weisselberg, *Saving Miranda,* 84 Cornell L.Rev. 109, 110, 132–139 (1998) (collecting California training materials encouraging questioning "outside *Miranda* "). The police in this case sought to contravene *Miranda*'s

**22.** These courts find it necessary to conclude that a *Miranda–Edwards* violation is not just a violation of *Miranda* but constitutes the violation of a constitutional right. The Court's affirmation of *Miranda*'s constitutional underpinnings in *Dickerson* is sufficient to find that a *Miranda* violation alone, when the violation is clearly prescribed as a constitutional minimum, is sufficient to justify application of the fruit doctrine.

**23.** *Seibert* is not technically a "fruit doctrine" case. The arrestee in *Seibert* argued that the fruit doctrine should bar the introduction of her confession. *Seibert*, 542 U.S. at. 612. The *Seibert* Court acknowledged that the *El-*

*stad* Court had declined to apply the fruit doctrine to the circumstances at issue in those cases—inculpatory unwarned statements which led to inculpatory warned statements. In *Elstad,* the focus was on the effectiveness of mid-interrogation warnings. But the *Seibert* Court took great pains to distinguish Elstad and its holding, essentially finding that the second confession is the fruit of the first because it was separate and distinct from the first one. *Id.* The officers were still picking from the initial poisonous tree. As Justice Breyer stated in his concurrence, the plurality approach "in practice will function as a fruits test." *Seibert,* 542 U.S. at 618, 124 S.Ct. 2601.

purposes. The police officers ignored Gilkeson's repeated requests in a calculated manner in an attempt to confuse the defendant and/or to undermine his understanding of the effect of his assertion of his right to counsel.

As the dissent in *Patane* explained, the issue is not whether the nontestimonial nature of the evidence is directly tied to the Self–Incrimination Clause, but whether by admitting the *Miranda*-offending evidence an incentive is created for police misconduct. *See Patane,* 542 U.S. at 645, 124 S.Ct. 2620. As a practical matter, once an arrestee has invoked the right to counsel, the police know that the interview is the last opportunity they will have to interrogate the arrestee without counsel. There is no incentive to cease questioning if the arrestee can be induced to make incriminating statements or to reveal information which leads to physical evidence that can be admitted in a subsequent criminal case. The fact that the statements themselves would not be admissible is not a sufficient remedy to protect the individual's right to be free from compelled self-incrimination.

Finally, beyond the *Miranda–Edwards* violation, the police conduct in this case is not of the same nature as the benign police conduct in *Tucker* (incomplete *Miranda* warnings), *Elstad* (police oversight in failing to warn) or *Patane* (police warning interrupted by arrestee). The circumstances here are akin to the custodial circumstances of concern in *Miranda.*

An individual swept from familiar surroundings into police custody, surrounded by antagonïstic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.

*Miranda,* 384 U.S. at 461, 86 S.Ct. 1602. Gilkeson was interrogated at the police station by successive officers for a period for approximately seventeen hours until 4:00 a.m. These circumstances of prolonged interrogation are the exact circumstances the *Miranda* Court found required additional procedural safeguards. Having said that, it is important not to overstate them as a factor in this analysis. The rule that interrogation must cease upon invocation of the right to counsel must be scrupulously honored in a per se manner, regardless of the duration of the questioning.

There are no countervailing objectives implicated that would require a contrary holding of not implying the fruit doctrine. Absent the defendant's statements about the computer in the barn—made after his requests for counsel were ignored—the police had no information upon which to request that he sign the consent form. Moreover, the circumstances of the interrogation including the conduct of the police implicate *Miranda's* deterrence rationale. In a deliberate attempt to avoid the requirements of *Miranda,* the police officers engaged in a specific technique. The officers intentionally ignored defendant's requests for counsel, immediately left the room only to return a short time later to resume the interrogation as if the requests had not been made. This denial of the defendant's requests for counsel clearly violates the minimal constitutional protections provided by *Miranda* and its progeny as affirmed in *Dickerson.*

Therefore, the derivative evidence seized from the defendant at the address of his barn is subject to the fruit doctrine and is inadmissable for the prosecution's case in chief. Defendant's motion to suppress the evidence seized from his barn computer will be granted.

## III. DETENTION ORDER

 As the Government considered the defendant to be both a flight risk and a danger to the community it moved to detain him pending trial pursuant to the Bail Reform Act of 1984, 18 U.S.C. § 3141. On August 19, 2005, after a hearing in accordance with 18 U.S.C. § 3142(f), Magistrate Judge Lowe ordered his detention.[24] The defendant appeals that decision pursuant to 18 U.S.C. § 3145(b). "A district court reviews de novo a magistrate judge's order of pretrial release or detention." *United States v. Minnici*, 128 Fed.Appx. 827, 828 (2d Cir.2005) (citing *United States v. Leon*, 766 F.2d 77, 80 (2d Cir.1985)).[25]

 Gilkeson is charged with receiving child pornography via computer and the internet, in violation of 18 U.S.C. § 2252A(a)(2)(A), and possessing child pornography that had been transported in interstate commerce, in violation of 18 U.S.C. § 2252A(a)(5)(B). At the time of the hearing there was probable cause to believe that the defendant committed a crime in violation of 18 U.S.C. § 2252A(a)(2)(A). Thus, a statutory presumption arose "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C 3142(e). This presumption is subject to rebuttal by the defendant who must "introduce some evidence contrary to the presumed fact." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir.1991) (citation omitted). "Even in a presumption case ... [t]he government retains the ultimate burden of persuasion by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) (citation omitted).[26]

 The defendant argues that he is not a flight risk. He is employed, has substantial ties to the area and no criminal record. The defendant complains that the Pretrial Services Report ("PSR"), relied on by the magistrate judge, assesses the defendant as a risk of flight because of his lack of employment but that he is actually self-employed: he owns and operates a barn storage facility; acts as an independent distributor for "Ecoquest International", d/b/a Fresh Indoor Air and Water; and, owns a company "Note Loans Inc.", which buys and sells mortgage notes.

Gilkeson also argues that he has substantial ties in the area, including his elderly mother, with whom he resides, and two brothers. Moreover, he is a lifelong resident, save for scattered short durations of work-related residences elsewhere. He adds that the PSR also cites significant financial resources as a reason defendant would be a risk of flight. He asserts that his financial resources are more indicative that he would not flee because more than half of the $83,250 the PSR lists as his assets are non-liquid assets that he would risk losing if he were to abscond.

"Once a defendant introduces rebuttal evidence, the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be

---

**24.** Of course, Magistrate Judge Lowe did not have the benefit of the instant decision.

**25.** The Pretrial Services Report, its exhibits, and the suppression hearing testimony were considered in conducting the *de novo* review.

**26.** "[T]he government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community." *Mercedes*, 254 F.3d at 436. Because the detention order will be upheld and detention maintained due to the defendant's status as a flight risk, considerations of whether he may be deemed a danger to society under this heightened burden need not be addressed.

considered when deciding whether to release a defendant." *Id.*

To determine whether the presumptions of dangerousness and flight are rebutted, the district court considers:

(1) the nature and circumstances of the crime charged;

(2) the weight of the evidence against the defendant;

(3) the history and characteristics of the defendant, including family ties, employment, community ties, past conduct;

(4) the nature and seriousness of the danger to the community or to an individual.

*Id.* (quoting 18 U.S.C. § 3142(g)).

Gilkeson faces a significant period of incarceration if convicted. He does not have a criminal record, however, this is not his first interaction with police regarding his conduct and minor females. As explained by Judge Lowe, defendant's family ties to the area—an elderly mother and two brothers—are not as meaningful a tie for a forty-nine year old man as a spouse and children. Despite his education and health, he does not maintain regular employment or earn enough income from the above-listed pursuits for them to be considered a significant tie to the area. The fact that half of his assets are non-liquid assets is not a compelling argument against detention. Whatever the attachment to his non-liquid assets, the liquid assets would present sufficient funding for flight from the jurisdiction. Regardless of the duration, he has traveled significantly and lived in Connecticut, Massachusetts, Florida, California and the Philippines.

The favorable information stressed by the defendant does not outweigh the factors that indicate he will flee; therefore, he has failed to overcome the presumption that alternative conditions of confinement are sufficient to ensure his appearance and he shall remain detained pending trial.

## IV. *CONCLUSION*

The defendant's motion to suppress evidence seized from his barn computer because it followed an illegal arrest will be denied as the Syracuse Police had probable case to effect the arrest. However, the evidence must be suppressed pursuant to the fruit doctrine because it was obtained in violation of *Miranda*. The magistrate judge's detention order will not be disturbed.

Therefore, it is

ORDERED that

1. Defendant James Gilkeson's motion to suppress the evidence seized at 360 Trim St., Kirkland, New York on August 15, 2005, is GRANTED.

2. The Order of Detention Pending Trial issued by Magistrate Judge George H. Lowe and ordering his detention is AFFIRMED. The defendant shall remain committed to the custody of the Attorney General or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.

IT IS SO ORDERED.