December 17, 2018

**Supreme Court**

No. 2016-340-C.A.

(P1/15-848AG)

State                              :

    v.                              :

Sendra Beauregard.                  :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                          :

            v.                                  :

Sendra Beauregard.                             :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Indeglia, for the Court.**  After a trial in Providence County Superior Court, a jury found the defendant, Sendra Beauregard (Beauregard or defendant), guilty of one count of second-degree murder and one count of discharging a firearm while committing a crime of violence.  On appeal, the defendant argues that the trial justice erred, pursuant to the fruit of the poisonous tree doctrine,[1] in allowing a firearm and ammunition into evidence after the Providence police obtained statements from the defendant in violation of her constitutional right to remain silent and right to counsel.  Moreover, the defendant contends that the trial justice erred in failing to exclude the physical evidence obtained through the defendant's statements, asserting that her statements were involuntary and the product of coercion.  Finally, the defendant avers that the trial justice erred in failing to suppress the physical evidence seized from her vehicle because the Providence police violated her constitutional rights pursuant to the Fourth Amendment to the United States Constitution by impounding her vehicle without probable cause.  For the reasons set forth herein, we affirm the judgment of the Superior Court.

---

[1] In *Wong Sun v. United States*, 371 U.S. 471 (1963), the United States Supreme Court extended the "fruit of the poisonous tree" doctrine—which originally excluded physical evidence obtained "by exploitation of * * * illegality"—to verbal evidence derived from illegal searches and seizures. *Wong Sun*, 371 U.S. at 485-86.

- 1 -

# I

## Facts and Travel

On March 17, 2015, a grand jury indicted defendant on count one, first-degree murder, in violation of G.L. 1956 § 11-23-1; and count two, discharging a firearm while committing a crime of violence, in violation of G.L. 1956 § 11-47-3.2(b)(4). The following facts give rise to these charges. At the time of her death, Pamela Donahue (Donahue) shared her apartment with Walter Woodyatt (Woodyatt), her former boyfriend. At trial, Woodyatt testified that he had a strained relationship with Donahue due to his drinking and her drug use. He explained that his romantic relationship with Donahue ultimately ended, but that he still lived in Donahue's apartment at the time in question. Following the end of her romantic relationship with Woodyatt, Donahue met defendant while they were both staying in the hospital, and the two began dating.

On December 1, 2014, the day before Donahue was murdered, defendant went to the Providence police station to discuss concerns she had regarding Donahue's drug use and her abusive relationship with her drug dealer, with whom, according to defendant, Donahue had had sexual relations. After spending approximately thirty minutes speaking with a detective at the police station, defendant left without ever identifying Donahue by name.

In the late afternoon of December 2, 2014, Woodyatt arrived at Donahue's apartment, after spending several hours at a local bar, to find Donahue and defendant talking; he alleged they were also doing drugs. Woodyatt testified at trial that, around 7:45 p.m., defendant gave him $40 and asked him to go "to the store right across the street" to get three packs of cigarettes and soda. Woodyatt testified that he obliged, and that he thought it was odd when he saw defendant pulling away in her vehicle as he left the store with defendant's change and the items she had requested. Woodyatt testified that he proceeded back to the apartment and that his

announcement of arrival went unanswered. Woodyatt described finding Donahue face down on the floor; he testified that he "couldn't get her up." At 8:25 p.m., Woodyatt, unable to find the apartment phone, went upstairs to use a neighbor's phone to call the police; he informed them that he believed Donahue had overdosed.

After the paramedics arrived and transported Donahue's body to the hospital, the police looked around the apartment for about an hour and a half, collecting drugs and cell phones. Woodyatt testified that, after the detectives left, he learned that Donahue had died. Later that same night, Woodyatt testified, defendant called the landline phone at the apartment and asked how Donahue was doing. Woodyatt informed defendant, "She's dead[,]" and defendant hung up the phone. Upon examining Donahue's body, the medical examiner determined that a gunshot wound to the chest had caused Donahue's death. An investigation ensued.

## A

### The First Interview

On December 3, 2014, detectives met defendant at her Johnston, Rhode Island, apartment, and defendant agreed to accompany them to the Providence police station to discuss Donahue's death. During that time, other detectives began drafting a search warrant for defendant's apartment, and Johnston police secured the scene. Police conducted a search of defendant's apartment around 11:00 p.m. and found nothing of evidentiary value. However, while at defendant's apartment, detectives located her white Kia in the back parking lot of the apartment complex and towed the vehicle to the Providence police station for secure keeping until police could apply for a search warrant. That warrant was obtained and executed the next day, December 4, 2014. The police seized a shell casing and three cell phones from defendant's vehicle.

In the interim, Detectives William Corrigan and Frank Villella of the Providence police department initiated an interview (the first interview)[2] with defendant at the police station and read defendant her *Miranda* rights.[3] Detective Corrigan testified that defendant confirmed that she understood her rights and that she checked a box on the rights form acknowledging as much. He testified that defendant told the detectives that someone had stolen money from her bank account during her recent stay in the hospital. Moreover, Det. Corrigan testified that defendant told detectives that she had been in a relationship with Donahue for several years.

Finally, Det. Corrigan testified that defendant admitted to having had an argument with Donahue on the night of December 2, 2014, and that defendant told the detectives that she left the apartment soon after she sent Woodyatt to get cigarettes and soda because Donahue had asked her to leave. Approximately twenty-five minutes into the interview, defendant requested counsel and the police terminated the interview. At that time, defendant was not under arrest and she left the station. Detective Corrigan testified that, based on his extensive experience dealing with individuals under the influence of narcotics or alcohol, defendant did not appear to be inhibited by either during that interview.

**B**

**The Second Interview**

Nine days later, on December 12, 2014, police obtained an arrest warrant for defendant. On December 22, 2014, police located and arrested defendant and transported her to the police station, where Officer Kathleen Chamberlain booked and processed defendant around 2:30 p.m.[4]

---

[2] This first interview was video recorded but did not include any audio. Detective Corrigan testified that the recording system was new and captured the video portion, but not the audio. The trial justice viewed this recording at the suppression hearing.

[3] *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).

[4] Officer Chamberlain is a detention officer at the Providence police department.

Detective Carlos Sical and Det. Corrigan arrived at the cellblock shortly before 5:00 p.m. and took defendant to an interview room for questioning (the second interview).[5]

At the outset of the second interview, which began at 4:50 p.m., defendant asked the detectives if her attorney had contacted the police; Det. Corrigan informed defendant that the attorney had not. Detective Corrigan then read defendant her rights again. Near the beginning of the interview, defendant referenced counsel twice more. At one point she asked, "I mean, do I get my lawyer in here with * * * me then? I don't want to be alone if that's (inaudible). I don't know. I mean, I do know. I don't want to be alone." Then, after a short time, the following discussion occurred:

| | |
|---|---|
| "[DEFENDANT]: | * * *. I mean, my lawyer was called. But can you—can you call him again? See if he can come listen and understand what—what's going on? |
| "DETECTIVE CORRIGAN: | So you want your lawyer present? Is that—is that what you're saying? |
| "[DEFENDANT]: | Yeah. I—I want—it's not 'cause I want to be (inaudible). |
| " * * * | |
| "[DEFENDANT]: | I just want someone to advocate for me. * * *." |

Nevertheless, the detectives did not stop the interview, and the conversation continued. During this interview, the detectives informed defendant that, in searching her vehicle, the police had found a shell casing in the front passenger side. The defendant denied any knowledge or

---

[5] The second interview was video recorded and included audio. The trial justice viewed and listened to this video at the suppression hearing.

involvement regarding the shell casing. Instead, defendant proposed the idea that perhaps someone had planted the shell casing in her vehicle in an effort to "pin" the crime on her. Until this point, defendant and the detectives had remained quiet and calm in their exchanges. However, after the detectives informed defendant about the shell casing, the video recording of the interview reveals, defendant became tense and raised her voice for a moment. The detectives also became argumentative for a short time.

After that, the remainder of the second interview proceeded in a conversational and seemingly relaxed manner, and defendant continually denied any involvement in Donahue's murder. Eventually, defendant stated, "I thought I was supposed to have a lawyer here for questioning." The detectives, again, continued to question defendant. At some point thereafter, defendant asked the detectives if they had anything else to tell her, at which time the detectives told defendant that "[t]he bullet—the shell casing we found in your car, it matches the bullet that we found in her body." In response, defendant repeatedly told detectives that was "impossible."

Subsequently, defendant again invoked her right to counsel:

| "[DEFENDANT]: | You're supposed— |
|---|---|
| "DETECTIVE SICAL: | Sendra— |
| "[DEFENDANT]: | —to have a lawyer here. You're not even supposed to continue to talk to me. Why can't— |
| "DETECTIVE SICAL: | Do you want your lawyer? |
| "[DEFENDANT]: | Well, I called him before. He said he called down to the station. Did we check—now what do we do now? I've never been through this before. |

" * * *

" * * *

- 6 -

"  *  *  *

"  *  *  *

"DETECTIVE SICAL:          We've asked you several times."

After a few more exchanges, defendant stated:

"[DEFENDANT]:          I know. * * * I said, 'Yes, I do want
him here.' * * *."

Shortly thereafter, at approximately 6:15 p.m., the detectives ended the interview and brought defendant back to the cellblock. Detective Corrigan candidly testified that he was aware that he was legally required to stop questioning defendant once she requested counsel; however, he had continued to question her after her first requests for counsel in an effort to elicit information and because she had continued talking.

Officer Chamberlain testified that, upon arriving back at the cellblock, defendant placed her one allotted phone call to her attorney. Officer Chamberlain further testified that she was unaware if defendant's attorney had answered the call and that, while she did stand close by, she did not listen to defendant's exact words because it was a "private phone call[.]" Officer Chamberlain also testified that, at around 8:00 p.m., defendant "was hollering for [Officer Chamberlain] to come" to her cell, at which time defendant requested to speak with the detectives. Officer Chamberlain testified that she contacted the detectives and that, at around 9:00 p.m., the detectives arrived at the cellblock to take defendant back to the interview room. Lastly, Officer Chamberlain testified that, between the time detectives brought defendant back to her cell after the second interview and the time that defendant requested to speak to the detectives again, no detective or police officer spoke with defendant in the cellblock.

## C

### The Third Interview

Sergeant Fabio Zuena, of the Providence police department detective division, and Det. Sical conducted the next interview (the third interview).[6]  Sergeant Zuena testified that he believed defendant had stated that she was cold as the detectives took her from the cellblock to the interview room; so, at the onset of the third interview, Det. Sical gave defendant a jacket. After that, the interview began with the following exchange:

| | |
|---|---|
| "DETECTIVE ZUENA: | Before we get started, you approached them downstairs, you wanted to speak to us again? |
| "[DEFENDANT]: | Yes. That's right. |
| "DETECTIVE ZUENA: | What did you tell them downstairs? |
| "[DEFENDANT]: | No, nothing. |
| "DETECTIVE ZUENA: | Oh, you just told them you wanted— |
| "[DEFENDANT]: | Yeah. |
| "DETECTIVE ZUENA: | —to speak to detectives again? |
| "[DEFENDANT]: | Yeah. |
| "DETECTIVE ZUENA: | Okay. You understand you had your rights before? And in the middle you wanted the attorney? |
| "[DEFENDANT]: | Yeah.  He was never called. |
| "DETECTIVE ZUENA: | Okay. So— |
| "[DEFENDANT]: | (Inaudible) |

---

[6] Detective Corrigan was unable to return to the station for the interview that night, and therefore Sgt. Zuena filled in.

| | |
|---|---|
| "DETECTIVE ZUENA: | —and then you expressed to them that you wanted to speak to us again? |
| "[DEFENDANT]: | Yes. |
| "DETECTIVE ZUENA: | So now you want to speak to us again? |
| "[DEFENDANT]: | That's right. |
| "DETECTIVE ZUENA: | All right. We just want to make sure. |
| "DETECTIVE SICAL: | Just so you know, the same rules apply. Okay? |
| "[DEFENDANT]: | Yeah. The same rules apply." |

As the exchange demonstrates, in the third interview, the detectives did not formally re-"Mirandize" defendant.

Eventually, defendant admitted to the detectives that she had bought a gun for her protection. The defendant proceeded to confess to using the gun to shoot Donahue one time in the chest. After defendant confessed to murdering Donahue, she explained that she buried the gun at a location off Route 116 in Scituate, Rhode Island. The detectives then asked defendant to bring them to where the gun was buried "because [they] wouldn't want anybody else to get hurt with [it]." The detectives proceeded to tell defendant that they "really [didn't] want anybody to find it, especially a small child * * * playing in the area, to find it and hurt themselves." Ultimately, defendant agreed to go with the detectives the next morning to show them where she buried the gun.

**D**

**The Fourth Interview**

At approximately 9:30 a.m. the next day, Detective Jason Simoneau and Det. Corrigan transported defendant to a park in Scituate where she had informed them that she had hidden the

gun (the fourth interview).[7] Due to inclement weather, after pointing officers in the general direction of the gun, defendant remained in the police cruiser as the detectives searched for the gun. Eventually, the detectives located the gun, and ammunition, hidden under leaves. The detectives did not read defendant her *Miranda* rights at any time that morning.

## E

## Pretrial Motions, Trial, and Appeal

Prior to trial, defendant filed two separate motions to suppress—the first, in May 2015, dealt with the search and seizure of defendant's vehicle; and the second, in October 2015, just prior to trial, sought the suppression of defendant's statements to police and the physical evidence obtained from those statements. In an effort to give more context to the crux of the arguments, we will first consider defendant's *Miranda* arguments regarding the motion to suppress the statements and physical evidence obtained therefrom, and then we will address defendant's motion to suppress concerning the search and seizure of her vehicle.

On October 16 and 20, 2015, the trial justice heard arguments on defendant's motion to suppress her statements to police, as well as a motion to suppress the physical evidence that was obtained as a result of those statements. At the October 20, 2015 hearing, the state conceded that the Providence police had violated defendant's *Miranda* rights with regard to the second, third, and fourth interviews. Accordingly, the parties and the trial justice agreed that defendant's statements in each of those interviews required suppression at trial.[8] Therefore, the remaining issue for the trial justice to consider was whether, in light of the *Miranda* violations, the gun and

---

[7] Detective Corrigan testified that he believed Lieutenant Figueiredo and Bureau of Criminal Investigation Detectives Braga and Moscarelli were also present that morning.
[8] At the suppression hearing, the state also requested that defendant's statements be deemed admissible for impeachment purposes should she decide to testify at trial; the trial justice agreed in her written decision. The defendant chose not to testify at trial.

ammunition that defendant had led the police detectives to in Scituate were inadmissible physical evidence, as the fruit of defendant's inadmissible statements.

The defendant contended that the trial justice should reject the Supreme Court's holding in *United States v. Patane*, 542 U.S. 630 (2004), in which the Supreme Court declined to extend the fruit of the poisonous tree doctrine to exclude physical evidence obtained through voluntary but unwarned confessions. *Patane*, 542 U.S. at 636-37. Instead, defendant urged the trial justice to follow the lead of other states and broaden protections under the Rhode Island Constitution. The defendant also argued that, even if the trial justice did find *Patane* controlling, the physical evidence is nevertheless inadmissible because her mental illness and the alleged coercive nature of the interrogation rendered her confession involuntary and outside the parameters of *Patane*. The state argued, however, that the physical evidence that the Providence police obtained by way of defendant's statements was admissible, notwithstanding the *Miranda* violations, because of the holding in *Patane*. The state further contended that a suspect's mental illness is not dispositive in determining coercion; instead, the nature of the police conduct is controlling.

On November 12, 2015, the trial justice issued a written decision denying defendant's motion to suppress. The trial justice thoroughly explained the split among states' interpretations and applications of *Patane*, ultimately concluding that she was constrained to follow the approach announced in *Patane*, based on this Court's jurisprudence. Moreover, the trial justice awarded no merit to defendant's contention that her confession was involuntary. The trial justice determined that the detectives did not violate defendant's rights during the interrogations when they made "misstatements" regarding the link between the bullet found in Donahue's body and the shell casing found in defendant's vehicle. The trial justice also concluded that the police

- 11 -

acted lawfully in waiting more than fourteen days, after they first questioned her on the day after Donahue's murder, to arrest defendant and conduct the second interview.

The defendant's trial began on November 12, 2015, and concluded on November 24, 2015, when a jury found defendant guilty of second-degree murder on count one and guilty of discharging a firearm while committing a crime of violence on count two. On January 8, 2016, the trial justice denied defendant's motion for a new trial. Thereafter, on March 4, 2016, the trial justice imposed a life sentence on count one and a consecutive life sentence on count two.

On March 9, 2016, defendant appealed her convictions to this Court. She argues on appeal that the trial justice erred in admitting the physical evidence obtained as a result of what defendant asserts were involuntary and coerced statements in violation of *Miranda*. Moreover, defendant avers that the seizure of her vehicle was unlawful and the evidence obtained therein was tainted physical evidence.

We will first address whether the trial justice erred in allowing the firearm and ammunition into evidence at trial, in light of the fact that the Providence police obtained defendant's statements in violation of her right to remain silent and her right to counsel under *Miranda*. Next, we will consider whether defendant's statements were involuntary and, if so, whether the trial justice therefore erred in declining to suppress the physical evidence. Finally, we will consider whether the impounding of defendant's vehicle by the Providence police violated her protections against unreasonable searches and seizures guaranteed under the United States and Rhode Island Constitutions and whether any evidence seized therefrom was tainted and inadmissible.

## II

### Standard of Review

When we review a trial justice's decision on a motion to suppress, we engage in a two-step process. *See State v. Hall*, 940 A.2d 645, 656 (R.I. 2008). First, "we 'defer to the trial justice's findings of historical fact concerning the voluntariness of the confession unless those findings are clearly erroneous.'" *State v. Tejeda*, 171 A.3d 983, 1000 (R.I. 2017) (quoting *State v. Musterd*, 56 A.3d 931, 938 (R.I. 2012)). Second, because the issues we address herein are "of constitutional dimension, we accept the historical facts and credibility determinations, and then conduct a *de novo* review of the trial justice's conclusion that the confession was voluntary." *Hall*, 940 A.2d at 656.

## III

### Discussion

### A

### Admission of Physical Fruits of Unwarned Statements

Prior to commencing our analysis, we reiterate that the state conceded prior to trial that defendant's statements during her second, third, and fourth interviews required suppression and could not be used against her at trial, except for impeachment purposes. Therefore, the issue before this Court is whether law enforcement's failure to comply with *Miranda* requires the suppression of the physical evidence acquired as a result of a suspect's unwarned, but voluntary, statements. In answering this question, this Court must first decide whether to adopt the United States Supreme Court's 2004 holding in *Patane*, where the Court concluded that suppression is not required in such instances. *See generally Patane*, 542 U.S. 630. In appealing the trial justice's decision, defendant avers that we should instead follow the lead of other state courts and

provide broader protections based on our state constitution. To accept defendant's argument in this respect would require that we hold that our state constitution provides broader protections than the Self-Incrimination Clause of the United States Constitution.

In *Patane*, the Supreme Court addressed "whether a failure to give a suspect the [*Miranda*] warnings * * * requires suppression of the physical fruits of the suspect's unwarned but voluntary statements." *Patane*, 542 U.S. at 633-34. There, a police officer attempted to read the defendant his rights, and the defendant interrupted and informed the officer that he was aware of his rights. *Id.* at 635. The officer proceeded to act on information he received prior to the interaction and asked the defendant, a convicted felon, if he had a firearm in his residence. *Id.* After the defendant hesitated in responding, the officer persisted, and, ultimately, the defendant informed the officer of the location of a pistol in his home, and the officer seized the firearm. *Id.* Prior to trial, the defendant filed a motion to suppress the pistol, arguing in part that the officer unlawfully obtained the firearm as the fruit of an unwarned statement. *Id.*

The Supreme Court held that the admission of the physical fruits of a voluntary statement into evidence will not implicate the Self-Incrimination Clause, finding "no justification for extending the *Miranda* rule to [that] context." *Patane*, 542 U.S. at 636-37. The Supreme Court reasoned, "the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause." *Id.* at 636. Moreover, the Supreme Court explained that "the core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial[,]" and "[t]he Clause cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements." *Id.* at 637. Additionally, the Supreme Court stated, "any further extension of [prophylactic] rules must be justified by its necessity for the protection of the actual right against compelled self-

incrimination. * * * Indeed, at times the Court has declined to extend *Miranda* even where it has perceived a need to protect the privilege against self-incrimination." *Id.* at 639; *see, e.g.*, *New York v. Quarles*, 467 U.S. 648, 657 (1984). The Supreme Court also drew an important distinction between unreasonable searches that violate the Fourth Amendment and failure to properly "Mirandize" a suspect, and concluded that the exclusion of unwarned statements at trial is a sufficient remedy for *Miranda* violations. *Id.* at 641-42.

While this Court has not yet had the opportunity to address this issue, several other jurisdictions have. In the wake of *Patane*, state courts are at odds as to whether their state constitutions would produce the same result as in the *Patane* holding. Accordingly, some states have construed their own constitutions as requiring broadened protections against self-incrimination. Those states decline to follow *Patane*, and extend *Miranda*-violation remedies to prohibit the admission of physical evidence. *See, e.g.*, *Commonwealth v. Martin*, 827 N.E.2d 198, 203 (Mass. 2005); *State v. Farris*, 849 N.E.2d 985, 996 (Ohio 2006); *State v. Vondehn*, 236 P.3d 691, 700 (Or. 2010); *State v. Peterson*, 923 A.2d 585, 593 (Vt. 2007); *State v. Knapp*, 700 N.W.2d 899, 921 (Wis. 2005).

On the other hand, many state courts have elected to follow the *Patane* holding, deeming the physical evidence of an unwarned, but voluntary, statement admissible. These states provide the same protections available under federal law. For example, in *Coleman-Fuller v. State*, 995 A.2d 985 (Md. Ct. Spec. App. 2010), the Court of Special Appeals of Maryland followed the Supreme Court and concluded that photographs obtained as a result of a voluntary statement by the defendant were admissible, notwithstanding the fact that the officers disregarded the defendant's unambiguous request for an attorney. *Coleman-Fuller*, 995 A.2d at 1001, 1005-06.

There, the court reasoned that the nontestimonial evidence derived from the voluntary statement fell squarely under the holding of *Patane*. *Id.* at 1005-06.

Moreover, in *In re H.V.*, 252 S.W.3d 319 (Tex. 2008), the Texas Supreme Court mirrored the *Patane* holding in a similar factual scenario as the one now before this Court. *In re H.V.*, 252 S.W.3d at 329. There, after giving the defendant his *Miranda* warnings, and after the defendant invoked his right to counsel, the police officers continued to question the defendant until he eventually disclosed the location of the murder weapon. *Id.* at 321. The Texas Supreme Court affirmed the lower court's decision to suppress the defendant's statements that the officers had obtained unlawfully, but reversed the lower court's holding that suppressed the murder weapon as fruit of the poisonous tree. *Id.* at 329. The Texas Supreme Court relied on *Patane* in reasoning that—absent police coercion or other situations rendering a confession involuntary—a *Miranda* violation does not require suppression of physical evidence. *Id.* at 329; *see also State v. John*, 123 So. 3d 196, 202, 203 (La. Ct. App. 2013) (adopting *Patane* in deeming physical evidence of an unwarned, voluntary statement admissible).

We are mindful of our consistent adherence to the Supreme Court's analysis of the Fifth Amendment to the United States Constitution when we interpret article 1, section 13 of our constitution.[9] Article 1, section 13 of the Rhode Island Constitution provides that "[n]o person in a court of common law shall be compelled to give self-criminating evidence." R.I. Const. art. 1, sec. 13. Unlike the Massachusetts Supreme Judicial Court, which has consistently expanded

---

[9] We do note, however, that this Court has at times declined to adhere to the federal standards and has broadened certain portions of the Rhode Island Constitution to offer greater protection than required pursuant to federal law pertaining to the Fourth and Sixth Amendments. *See, e.g.*, *Pimental v. Department of Transportation*, 561 A.2d 1348, 1351 (R.I. 1989) (holding that article 1, section 6 of the Rhode Island Constitution grants broader protections than the Fourth Amendment to the United States Constitution); *In re Advisory Opinion to the Senate*, 108 R.I. 628, 641, 278 A.2d 852, 859 (1971) (providing greater protections under our state constitution than the United States Constitution provides pursuant to the Sixth Amendment).

rights against self-incrimination under the commonwealth's constitution, we have regularly declined to extend those rights. *Compare Martin*, 827 N.E.2d at 203 (declining to follow *Patane* in light of article 12 of the Massachusetts Constitution because "[i]ts text, its history, and [the court's] prior interpretations conclusively establish that it provides greater rights than those enumerated in the Federal Constitution"); *with Rhode Island Grand Jury v. Doe*, 641 A.2d 1295, 1296-97 (R.I. 1994) (holding that the Court "should continue to interpret article 1, section 13, of the Rhode Island Constitution as coextensive with the protections guaranteed by the Fifth Amendment to the Constitution of the United States"), *and State v. Bertram*, 591 A.2d 14, 22 (R.I. 1991) (declining the defendant's invitation to follow the path of other jurisdictions that liberally construe the self-incrimination provisions to provide for greater protections).

As we have stated, "[a]n examination of Rhode Island case law * * * reveals that this [C]ourt has seldom, if ever, afforded criminal or civil defendants greater protection under article 1, section 13, of our State Constitution than has been afforded to criminal or civil defendants under the Fifth Amendment to the United States Constitution." *Rhode Island Grand Jury*, 641 A.2d at 1296 (quoting *Bertram,* 591 A.2d at 21). We went on to explain that "[p]rotections under article 1, section 13, of the Rhode Island Constitution have uniformly been interpreted as tantamount to those available under the Federal Constitution in matters relating to, for example, *Miranda* rights and waiver of those rights * * *." *Id.* (quoting *Bertram*, 591 A.2d at 21). Furthermore, "like the United States Supreme Court, [this Court] has traditionally distinguished between physical evidence and testimonial evidence when undertaking a self-incrimination analysis under article 1, section 13." *Bertram*, 591 A.2d at 22.

Accordingly, in contrast to those states that have declined to follow *Patane* and have broadened protections under their constitutions, this Court has long analyzed our constitution to

provide the same protections against self-incrimination as the United States Constitution. We believe there is great value in the doctrine of *stare decisis*, and we do not wish to abandon our prior opinions here. The doctrine of "stare decisis is important because [r]espect for precedent promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Knapp*, 700 N.W.2d at 924 (Wilcox, J., dissenting) (internal citations omitted); *see also Vasquez v. Hillery*, 474 U.S. 254, 265-66 (1986).

We also note that, here, the state was at an extreme disadvantage in not being able to use defendant's confession at trial due to the police officers' failure to lawfully react to defendant's request for counsel. We wish to make clear our grave disapproval of the conduct of the police in this matter and their repeated failure to respect defendant's request for counsel. Nevertheless, "[i]t is not for this Court to impose its preferred police practices on * * * law enforcement officials[.]" *See Patane*, 542 U.S. at 642. For these reasons, we adopt the protections announced in *Patane* and consequently hold that *Miranda* violations do not taint the admissibility of physical evidence that is the product of an unwarned and inadmissible statement, so long as that statement is voluntary.

**B**

**Applying *Patane*: The Voluntariness of Defendant's Statements**

As explained herein, *Patane* held that physical fruits of unwarned statements are only admissible if a defendant's statement is voluntary. In light of our adoption of *Patane*, we must now consider whether defendant's statements, which led the detectives to the gun and ammunition in Scituate, were voluntary.

"A defendant's statement is voluntary if it was 'the product of his [or her] free and rational choice' rather than 'the result of coercion that had overcome defendant's will at the time he [or she] confessed.'" *State v. Carter*, 744 A.2d 839, 845 (R.I. 2000) (quoting *State v. Garcia*, 643 A.2d 180, 188 (R.I. 1994)). We apply a clear-and-convincing evidence standard when determining if a suspect has voluntarily waived his or her *Miranda* rights. *State v. Gouin*, 182 A.3d 28, 34 (R.I. 2018). Furthermore, in determining whether a statement was voluntary, we consider the totality of the circumstances, which are derived from the circumstances surrounding the confession, the conduct of the police officers, as well as the "background, experience and conduct of the accused[.]" *Id.*

Here, defendant submits that her mental illness and the alleged police coercion deem her statements to the detectives involuntary, rendering *Patane* inapplicable. Specifically, defendant references the nineteen days that detectives allowed to pass between the first interview and the date on which she was arrested. Additionally, defendant refers to the detectives' falsified statements in the second interview, informing defendant that the shell casing seized from her vehicle matched the bullet found in Donahue's body. The defendant also highlights several instances where the detectives ignored her requests for counsel. Finally, defendant argues that the nature of the interview became combative after the detectives informed defendant about the shell casing that police had found in her vehicle and that she became "distraught."

Relying on *United States v. Gilkeson*, 431 F. Supp. 2d 270 (N.D.N.Y. 2006), defendant argues that the holding of *Patane* does not apply here. In *Gilkeson*, the court concluded that physical evidence was inadmissible against the defendant because his confession was the product of police coercion, making *Patane* inapplicable. *Gilkeson*, 431 F. Supp. 2d at 294. Not only is *Gilkeson* factually distinguishable on several grounds, that case also holds no precedential value

in this Court, as it is a decision from the United States District Court for the Northern District of New York.[10] There, the defendant claimed that police handcuffed him to a floor rail for several hours and repeatedly denied his requests to contact his attorney. *Id.* at 274. Additionally, several different police officers questioned the defendant over a span of roughly seventeen hours—until 4:00 a.m.—when the defendant ultimately signed a consent form. *Id.* at 294.

In considering whether police coercion elicited a statement, we look to the conduct of the police and do not consider the mental state of the suspect or defendant dispositive of coercion. This is so because "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). Moreover, the Supreme Court has explained that "the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Id.* (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)). This Court has also determined that a defendant who suffered from delusions had voluntarily made statements free from coercion. *See State v. Arpin*, 122 R.I. 643, 650 n.4, 655, 410 A.2d 1340, 1344 n.4, 1346 (1980); *see also State v. Brouillard*, 745 A.2d 759, 764 (R.I. 2000) (explaining that the "defendant's impaired mental state, if it was impaired, was irrelevant to the question of the voluntariness of his confession because it was not induced by the police or by any other state actor").

A review of the record of this case reveals that the Providence police did not coerce defendant. For instance, defendant did not endure prolonged interrogation, and she had the opportunity to call her lawyer—albeit after several requests. Furthermore, the detectives never employed abusive interrogation tactics to elicit information from defendant. Instead, a review of

---

[10] We would note that, while *United States v. Gilkeson*, 431 F. Supp. 2d 270 (N.D.N.Y. 2006), lacks precedential value on this Court, a federal district court decision could still be persuasive under certain circumstances. However, in light of the vastly different facts in that case as opposed to the one before us, it has no such value here.

the interrogation videos assures us that the interviews were relaxed in nature and conversational in tone for almost the entirety of each of the interviews. The detectives also provided defendant with water during the interviews, gave her a jacket, and agreed to inquire about getting a blanket for her to use in her cell. Officer Chamberlain testified that defendant also had food in her cell and that the officer placed more food in defendant's cell when the detectives brought defendant to the interview room. This case is also distinct from *Gilkeson* because, here, defendant voluntarily initiated the third interview with detectives when she summoned Officer Chamberlain to her cell and requested that she be allowed to speak with detectives again. The defendant in *Gilkeson* did not have a choice. *See Gilkeson*, 431 F. Supp. 2d at 274. At that time, Beauregard had the opportunity to make a phone call to her attorney. Officer Chamberlain testified that no one from the Providence police department interacted with defendant during that time. Notably, as the trial justice described, defendant appeared "intelligent, polite, alert, calm, rational and responsive during all three interviews," and "[h]er responses to the police questions were clear, thoughtful and reflective." We therefore opine that defendant's statements were not coerced on these grounds.[11]

Additionally, defendant avers that law enforcement's decision to wait nineteen days to arrest her was procedurally improper and indicative of coercion. However, in *Maryland v. Shatzer*, 559 U.S. 98 (2010), the Supreme Court held that, after a suspect invokes his or her right

---

[11] The defendant refers to her mental illness to argue that her statements were coerced and involuntary. Although it is not necessary to consider, we would highlight defendant's lucid train of thought as she maneuvered through the interviews with police, offering alternative theories for Donahue's murder and attempting to pass blame onto various other actors throughout the interview. The defendant offered an array of suspects as well as several alternative rationales to explain why she murdered Donahue. Additionally, defendant also suggested that the police planted the shell casing in her vehicle to frame her for the crime. These facts make us confident in our conclusion that defendant was not inhibited by a mental illness such as to render her confession involuntary.

to counsel, police must then wait at least fourteen days before reinitiating contact with the suspect. *Shatzer*, 559 U.S. at 110 (holding that fourteen days "provides plenty of time for the suspect to get reacclimated to his [or her] normal life, to consult with friends or counsel, and to shake off any residual coercive effects of his [or her] prior custody"). Based on this reasoning, the detectives here acted lawfully and reasonably in waiting that allotted amount of time between the first interview with defendant and her subsequent arrest. We do not view this as a coercive tactic.

Furthermore, defendant's contention that the detectives coerced her statements by misstating facts regarding the connection between the shell casing seized from her vehicle and the bullet found in Donahue's body similarly fails. The United States Supreme Court has held that "[t]he fact that the police misrepresented the statements that [a witness] had made is, while relevant, insufficient * * * to make [an] otherwise voluntary confession inadmissible." *Frazier v. Cupp*, 394 U.S. 731, 739 (1969). In light of the totality of the circumstances, we agree with the trial justice that the detectives' interview techniques did not amount to coercion and were not "sufficient to affect a voluntariness finding."

Accordingly, we cannot say that the trial justice clearly erred in determining that defendant's statements were voluntary. Therefore, pursuant to *Patane*, the gun and ammunition that defendant's unwarned statements led detectives to are admissible.

## C

### Impounding of Defendant's Vehicle

We next consider whether the trial justice erred in concluding that the police's seizure through the impounding of defendant's vehicle and the subsequent search of the vehicle were constitutional and the evidence obtained therein consequently admissible. As stated above, the

detectives obtained a search warrant for defendant's apartment after their first interview with defendant, which was at approximately 7:00 p.m. on December 3, 2014. Around 11:00 p.m. that same night, detectives executed the search warrant and found nothing of evidentiary value in defendant's apartment. After the detectives finished searching her apartment, they impounded defendant's white Kia, which was in a parking lot behind defendant's apartment complex. The next day, the police obtained a search warrant for defendant's vehicle; they performed the search at approximately 10:10 p.m. that day. In executing the search warrant, detectives uncovered a .38-caliber shell casing and three cell phones.

At the hearing on defendant's motion to suppress the shell casing and three cell phones that Providence police seized from her vehicle, defendant averred that the police had violated her Fourth Amendment rights when they seized her vehicle.[12] The defendant contended that the police did not have probable cause; and, therefore, defendant argued that the items seized were inadmissible. In opposing defendant's motion, the state contended that the police had probable cause to believe that defendant's vehicle contained evidence of Donahue's murder, particularly in light of the fact that they had just obtained a search warrant for defendant's apartment. The state additionally argued that the evidence obtained from defendant's vehicle was admissible under the automobile exception to the exclusionary rule.

On June 5, 2015, after considering the parties' memoranda and the relevant case law, the trial justice concluded that the police had reason to believe that defendant's vehicle contained evidence relating to Donahue's murder, and she therefore denied defendant's motion. The trial

---

[12] The parties did not orally argue this motion. At the beginning of the hearing, the trial justice explained that she had reviewed the papers submitted by the parties and proceeded to issue a bench decision.

justice further noted that the automobile exception would apply to allow the evidence seized from defendant's car, even without the warrant that the police had subsequently obtained.

In reaching her conclusion, the trial justice reviewed Woodyatt's detailed timeline of events, as described in his statement to police. Specifically, Woodyatt explained that he was in the apartment with defendant and Donahue just before Donahue was murdered. Woodyatt testified that defendant gave him $40 and asked him to go to the store across the street to get cigarettes and soda; as he left the store and made his way back to the apartment with the items and defendant's change, he saw defendant driving away in her white Kia. Upon returning to the apartment, after just a short time, Woodyatt found Donahue alone and unresponsive. Video surveillance from the convenience store corroborated Woodyatt's version of the events. Further, Woodyatt had described various occasions in the past in which he witnessed defendant and Donahue having both verbal and physical altercations. Finally, the trial justice noted that, "if the police had gone and got the warrant [before impounding the vehicle], they would have received the warrant based on * * * probable cause and obtained the same evidence." Accordingly, the trial justice declared that this case fell squarely within the holding of *State v. Werner*, 615 A.2d 1010 (R.I. 1992), and therefore the automobile exception to the warrant requirement clearly applied to the facts of this case.

In appealing the trial justice's denial of her motion to suppress, defendant contends that the Providence police violated her rights under both the Fourth Amendment to the United States Constitution and article 1, section 6 of the Rhode Island Constitution, because the police lacked the requisite probable cause to seize her vehicle. As such, defendant argues that the shell casing and three cell phones seized from her vehicle were tainted and consequently inadmissible at trial.

To the contrary, the state maintains that the trial justice correctly determined that the police had probable cause to seize defendant's vehicle. The state also argues that the seizure of the vehicle was necessitated by the circumstances because, on the day that defendant's vehicle was seized, defendant was not under arrest and therefore she could have moved the vehicle or discarded any evidence that was inside. Lastly, the state posits that the Providence police showed good faith in obtaining a warrant to search defendant's vehicle and that the police would have been justified in searching it in the parking lot of the apartment complex without a warrant.

Both the Fourth Amendment to the United States Constitution and article 1, section 6 of the Rhode Island Constitution protect individuals from unreasonable searches and seizures. Accordingly, to conduct a search, the police must have probable cause and a warrant, absent an exception to the warrant requirement. The Supreme Court has defined probable cause, in the automobile context, as "a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure[.]" *United States v. Ross*, 456 U.S. 798, 805 (1982) (quoting *Carroll v. United States*, 267 U.S. 132, 149 (1925)). Additionally, the Supreme Court explained, "the probable-cause determination must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the police officers." *Id.* at 808. This Court has held that, in the absence of a warrant, the automobile exception "permits a warrantless search of an automobile if there is probable cause to believe that its contents offend against the law * * * and if the attendant circumstances are exigent because the delay incident to obtaining a warrant would create a potential for the vehicle to be moved or its illegal contents disturbed." *State v. Benoit*, 117 R.I. 69, 72, 363 A.2d 207, 210 (1976).

The case now before us is analogous to the situation in *Werner*, in which we addressed the automobile exception. There, the police relied on facts from "eyewitnesses at the scene of the shooting [who] supplied officers with a detailed description of the assailant's car[.]" *Werner*, 615 A.2d at 1014. We held that the officer was justified in relying on the eyewitnesses' statements and thereafter searching the vehicle, without a warrant, seeking evidence relating to the crime. *Id.* We relied on Supreme Court opinions in holding "that exigency is no longer a requirement of the automobile exception" to the Fourth Amendment. *Id.* Moreover, we explained that "[a]s long as the police have probable cause to believe that an automobile * * * holds contraband or evidence of a crime, then police may conduct a warrantless search of the vehicle * * * even if the vehicle has lost its mobility and is in police custody." *Id.* at 1013-14.

We agree with the trial justice's probable-cause analysis, and hold that the Providence police had probable cause to justify the seizure of the defendant's vehicle under the automobile exception. The trial justice clearly and thoroughly articulated her review of the facts in making her determination that the Providence police had probable cause to impound and subsequently search the defendant's vehicle. Accordingly, we affirm the trial justice's denial of the defendant's motion to suppress the shell casing and three cell phones seized from that search.[13] We also note that, while in an abundance of caution, the Providence police, in good faith, sought and obtained a search warrant before searching the defendant's vehicle, the police would have

---

[13] The defendant argued below that there was an absence of exigency because defendant had possession of her vehicle for nearly twenty-four hours after Donahue's murder. While exigency is no longer a requirement for the automobile exception, the trial justice did explain why she believed exigent circumstances existed. In her decision, the trial justice noted that defendant's first interaction with the Providence police took place on December 3, 2014, when the police asked defendant to accompany them to the police station. At that time, defendant was not under arrest, and she was free to leave when the first interview ended. Accordingly, the trial justice concluded that the police had reason to believe that, in light of defendant's interactions with them, she might attempt to dispose of any evidence that may have been in her vehicle.

been justified in searching the vehicle prior to obtaining a warrant, based on the probable cause detailed herein.

## IV

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court. The record shall be returned to that tribunal.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Sendra Beauregard. |
| **Case Number** | No. 2016-340-C.A.<br>(P1/15-848AG) |
| **Date Opinion Filed** | December 17, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Gilbert V. Indeglia |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Susan E. McGuirl |
| **Attorney(s) on Appeal** | For State:<br><br>Jane M. McSoley<br>Department of Attorney General |
| | For Defendant:<br><br>Ronald L. Bonin, Esq. |